547 F.2d 575
 92 L.R.R.M. (BNA) 3059, 178 U.S.App.D.C. 278,
78 Lab.Cas. P 11,455, 81 Lab.Cas. P 13,151
 OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION,
AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
George ANGLE, d/b/a Kansas Refined Helium Company, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 23295, 23300, 23750 and 23751.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 30, 1975.
Decided June 7, 1976.
As Amended Jan 4, 1977.
 
 Robert Martin, Wichita, Kan., of the bar of the Supreme Court of Kansas, pro hac vice by special leave of court, for George A. Angle. W. Stanley Churchill, Wichita, Kan., was on the brief, for George A. Angle.
 Before McGOWAN and TAMM, Circuit Judges and BURNITA SHELTON MATTHEWS,* United States Senior District Judge for the United States District Court for the District of Columbia.
 McGOWAN, Circuit Judge:
 
 
 1
 This petition for an adjudication of civil contempt is the latest chapter in lengthy proceedings involving labor relations at the Kansas Refined Helium Company (KRH), a highly mechanized helium extraction plant located near Otis, Kansas, of which respondent Angle is the sole proprietor. Charges of unfair labor practices at KRH, first raised in 1966, resulted in issuance of a complaint by the General Counsel of petitioner National Labor Relations Board.[1]
 
 
 2
 On June 25, 1969, the Board found that unfair labor practices had been committed. 176 N.L.R.B. 1032 (1969). The Board also found that one of the six employees who had been reinstated pursuant to a district court order, see note 1 supra, was subsequently suspended and discharged in violation of the Act. 176 N.L.R.B. 1037 (1969). The Board's orders were granted enforcement in all respects by this court. Oil, Chemical & Atomic Workers v. NLRB, 144 U.S.App.D.C. 167, 445 F.2d 237 (1971), cert. denied, 404 U.S. 1039, 92 S.Ct. 713, 30 L.Ed.2d 730 (1972).
 
 
 3
 On July 12, 1972, the Board first petitioned this court to hold respondent in civil contempt. We appointed a Special Master pursuant to Fed.R.Civ.P. 53 to hear evidence and make findings respecting the alleged contumacy. Twice during the pendency of the contempt proceedings we ordered Angle to rescind the suspension or discharge of employees.[2] The Master conducted lengthy hearings on the petition, as amended, and on March 14, 1975, issued a report with recommended findings of fact and conclusions of law, which found all allegations of contemptuous conduct to be without merit. The matter is before us on petitioner's exceptions to that report.
 
 
 4
 I. PRELIMINARY ISSUES.
 
 
 5
 We confront two questions which are unrelated but which impinge upon our consideration of every allegation of contumacy. They are (1) what is the scope of review of findings by a Special Master, and (2) must an alleged contemnor have acted with wilfulness in order to be found in civil contempt.
 
 
 6
 A. Scope of Review.
 
 
 7
 Under rule 53(e)(2) of the Federal Rules of Civil Procedure, a court must accept the findings of fact of a master unless "clearly erroneous." This is the same standard as that governing appellate review of District Court findings of fact, see Fed.R.Civ.P. 52(a); 9 C. Wright & A. Miller, Federal Practice and Procedure, Civil, § 2614, at 809-10 (1971).[3] The party excepting to the master's findings carries the burden of proving them to be clearly erroneous, e. g., Case v. Morrisette, 155 U.S.App.D.C. 31, 475 F.2d 1300, 1307 (1973), and the court must uphold a finding, even if it is thought to go against the weight of the evidence, unless the error is clear, e. g., Zenith Radio Corp. v. Hazeltine Rsch., Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); United States v. National Ass'n of Real Estate Boards, 339 U.S. 485, 495-96, 70 S.Ct. 711, 94 L.Ed. 1007 (1950). At the same time, the mere fact that a finding is supported by substantial evidence does not prevent its being overturned if the reviewing court, with due regard for the master's opportunity to judge credibility, "is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 95 L.Ed. 746 (1948); accord, e. g., Zenith Radio Corp. v. Hazeltine Rsch. Inc., supra, 395 U.S. at 123, 89 S.Ct. 1562 and cases cited; W.R.B. Corp. v. Geer, 313 F.2d 750 (5th Cir. 1963). In this circuit, the clearly erroneous standard applies even to findings based on documentary evidence or inferences from undisputed facts. Case v. Morrisette, supra, at 1307; see 9 C. Wright & A. Miller, supra, § 2587. However, a master's conclusions of law are entitled to no special deference from the reviewing court, and will be overturned whenever they are believed to be erroneous.[4] E. g., Case v. Morrisette, supra, at 1308, and cases cited note 39.
 
 
 8
 While findings of fact need not be in any special form, they must disclose to the reviewing court the basis of the decision. E. g., Russo v. Central School Dist. No. 1, 469 F.2d 623, 628-29 (2d Cir. 1972), cert. denied, 411 U.S. 932, 93 S.Ct. 1899, 36 L.Ed.2d 391 (1973); Alpha Distributing Co. v. Jack Daniel Distillery, 454 F.2d 442, 453 (9th Cir. 1972). Moreover, in the instant case there are some issues presented as to which the Master made no findings of fact. Many of these involve evidence not controverted in the record and not challenged by respondent in his brief. In considering such issues, we adhere to the rule announced in Hurwitz v. Hurwitz, 78 U.S.App.D.C. 61, 136 F.2d 796, 799 (1943), that "(i)n cases where the record is so clear that the court does not need the aid of findings it may waive such a defect on the ground that the error is not substantial in the particular case."
 
 
 9
 B. Is Wilfulness Required?
 
 
 10
 Respondent has suggested that good faith or lack of wilfulness prevents an adjudication of contempt, conceding that he could provide no authority for this novel proposition, even as respects (1) alleged unilateral changes in wages, hours or conditions or (2) questions of Angle's liability in contempt for conduct of his subordinates, in which contexts the proposition was pressed most forcefully. We are not dealing here with criminal contempt. Nor are we dealing with the last stage in so-called three-stage civil contempt, consisting of (1) issuance of an order; (2) following disobedience of that order, issuance of a conditional order finding respondent in contempt and threatening to impose a specified penalty unless respondent purges himself of contempt by complying with prescribed purgation conditions; and (3) exaction of the threatened penalty if the purgation conditions are not fulfilled.
 
 
 11
 We are, rather, dealing with the second stage of this three-stage process, in which the court offers the respondent an opportunity to purge himself of contempt. In this context, the longstanding rule is that good faith or lack of wilfulness is not a defense that the petitioner must negate.[5] The rule is a salutary one, for the purpose of a motion for civil contempt, at least at this second stage, "is not to punish intentional misconduct, but rather to enforce compliance with an order of the court and to remedy any harm inflicted on one party by the other party's failure to comply." Doe v. General Hospital, 140 U.S.App.D.C. 149, 434 F.2d 427, 431 (1970).
 
 
 12
 II. ALLEGED VIOLATIONS INVOLVING THE DUTY TO BARGAIN.
 
 
 13
 We consider first the allegations that respondent unilaterally changed the terms and conditions of employment.
 
 
 14
 A. Alleged Unilateral Changes in Insurance Coverage.
 
 
 15
 The Master's findings on this issue were, in their entirety, as follows:The Group Health Insurance Policy covering the KRH employees also covered all other employees of the various Angle companies, approximately 150 in all. It was economically beneficial to both Angle and the KRH employees to provide coverage through one large group insurance policy rather than through a separate policy covering only the KRH employees. Tp. 413-16, 1456-57, Board Exhibit 53, Respondent Exhibit P. The change in insurance coverage for the year 1972 was required by the insurance carrier and was not initiated by Angle. Tp. 1457-60; Board Exhibit 53; Respondent Exhibits L, M, and N. Angle was attempting to maintain the same insurance coverage at the lowest possible premium rate and that made a change in insurance carriers advisable. Tp. 1458-59; Board Exhibit 53; Respondent Exhibit O.
 
 
 16
 Master's Report at 20.
 
 
 17
 In its exceptions, the Board raises two principal objections to these findings. First, although not generally disputing the facts as found by the Master, it objects to the implicit legal conclusion that Angle's good faith justifies a failure to bargain.[6] We believe this exception must be sustained. The Master's findings on this issue appear to rest upon an erroneous conception of the law that the employer's duty to bargain arises only when he is not acting in good faith which we are duty-bound to correct. The applicable principle is stated in NLRB v. Katz, 369 U.S. 736, 743, 747, 82 S.Ct. 1107, 1111, 1114, 8 L.Ed.2d 230 (1962):
 
 
 18
 Clearly, the duty thus defined (by section 8(d)) may be violated without a general failure of subjective good faith; for there is no occasion to consider the issue of good faith if a party has refused even to negotiate in fact . . ..
 
 
 19
 Unilateral action by an employer without prior discussion with the union does amount to a refusal to negotiate about the affected conditions of employment . . . and must of necessity obstruct bargaining, contrary to the congressional policy. It will often disclose an unwillingness to agree with the union. It will rarely be justified by any reason of substance. It follows that the Board may hold such unilateral action to be an unfair labor practice in violation of § 8(a)(5), without also finding the employer guilty of over-all subjective bad faith.
 
 
 20
 Thus it is clear that Angle's action was in contempt of the judgment of this court. We therefore decline to adopt the Master's findings and instead find the respondent in civil contempt for this failure to bargain.
 
 
 21
 The Board's second principal exception emphasizes the Master's failure to make any findings regarding a second change in insurance coverage, occurring at the end of 1972 with respect to the insurance policy effective during 1973. Uncontroverted documentary evidence indicates that this second change in insurance carriers effected many changes in coverage, see Petitioner's Exh. 54; see also Tr. at 1478-79, and increased the cost for single employees approximately $3.50 a month, see Petitioner's Exh. 55. It is undisputed that there was neither an offer by the company to bargain nor actual bargaining about these changes. Tr. at 377, 1478. Under the principle outlined above, there can be no doubt that this second unilateral change also violated the judgment of this court, and we accordingly find respondent in contempt in this respect.
 
 
 22
 B. Alleged Unilateral Changes in Work Assignment.
 
 
 23
 There is no question that sometime in 1971 or 1972, Angle, without any offer to bargain with the union, reorganized the job structure at KRH, creating new positions entitled "Operations Manager." The Operations Managers performed work that had been formerly performed by "Senior Operators," but they were also clearly given authority to be in charge of the operations on, and direct the members of, each shift, as well as to hire, discipline, assign, and discharge employees. Petitioner's Exh. 5. The new position of "Chief Operator" became the highest paying non-supervisory job.
 
 
 24
 There is no dispute between the parties concerning the effect of this reorganization. They agree that it created a new supervisory position and transferred to it bargaining unit work; it also lowered the highest paying non-supervisory position from a minimum of $3.95 per hour the lowest rate for Senior Operators to $3.70 per hour the new rate for Chief Operators. The controversy before us concerns when the change took place.
 
 The Master found that
 
 25
 Angle's reorganization of the job structure at the KRH plant was not in violation of the court's order. Reorganization was made necessary by the Board's decision that senior operators were not supervisors. Planning for reorganization began in April of 1971 and the various changes were accomplished prior to the time the court's order became effective.
 
 
 26
 Master's Report at 20.
 
 
 27
 Once again we are unable to adopt the Master's findings, for they appear implicitly to incorporate an erroneous view of the applicable legal standard. As we made clear in our original decision in this case enforcing the NLRB's orders,
 
 
 28
 . . . what the statute requires (to support a claim of supervisory status) is evidence of actual supervisory authority visibly translated into tangible examples demonstrating the existence of such authority. In NLRB v. Security Guard Serv., Inc., 384 F.2d 143, 149, the Fifth Circuit succinctly stated the essential point:
 
 
 29
 " * * * What is amiss with this argument which is based on paper credentials is that there is lack of actual authority to match. The concept of supervision has some elasticity, but it must have substance and not be evanescent. * * * A supervisor may have potential powers, but theoretical or paper power will not suffice. Tables of organization and job descriptions do not vest powers. * * * "
 
 
 30
 445 F.2d 237 at 243. The Master's findings reflect no awareness that this standard governs what everyone concedes to be the critical question was the job reorganization and consequent elimination of bargaining unit work effected before or after this court issued its mandate on September 10, 1971?
 
 
 31
 Viewing the record in the proper light, it is apparent that the Master's finding cannot stand. For neither the Master nor respondent points to sufficient evidence in the record to indicate that the job reorganization took place in practice, rather than on paper, before September 10, 1971. The evidence most closely connected with actual exercise of supervisory authority is a notice of April 29, 1971 from Angle to all KRH employees, which indicates that two members of the KRH maintenance staff were to be of equal status with the Senior Operators and were to work the Senior Operators "to coordinate whatever is necessary to see that plant maintenance is accomplished," and that the two maintenance men were to conduct a training program in maintenance while two experienced operations men were to conduct a training program in operations. Petitioner's Exh. 13.[7] Although it seems uncertain that such powers, if exercised, could alone sustain a claim of supervisory authority, we need not speculate in this regard. For this notice by itself is a far cry from constituting "evidence of tangible examples demonstrating the existence of (supervisory) authority." There is simply not adequate evidence in the record to support the Master's finding that the vesting of supervisory authority, as defined by our earlier opinion, was accomplished before this court issued its mandate. Thus, we find Angle unilateral elimination of bargaining unit work to be in contempt of this court's judgment.
 
 
 32
 III. ALLEGED COERCIVE ACTIVITY.
 
 
 33
 Petitioner alleges that Angle or one of his subordinates on a number of occasions engaged in activity whose coercive effect on the free exercise of Section 7 rights violated this court's judgment.[8] We consider first the legal question of Angle's responsibility for the acts of plant superintendent Al Pesicka, and then turn to individual incidents.
 
 
 34
 A. Angle's Liability for Pesicka's Actions.
 
 
 35
 The Master's report reaches inconsistent conclusions on the question of whether Angle was responsible for Pesicka's activities. At pp. 8-9, the Report states: "Angle is a strong-minded individual who, although he has other interests than the KRH plant, maintains close personal supervision over it. It is inconceivable that any of the actions of Pesicka were taken without authorization by Angle." But later, the Master indicates that three instances of allegedly coercive activity were undertaken not by Angle but by Pesicka without Angle's specific authorization, see p. 21, PP C, D(1), D(2), and the Master's complete exoneration of Angle appears implicitly to rest upon the view that Angle was not liable for Pesicka's actions.
 
 
 36
 Although we believe a factual finding that Angle had not expressly authorized or ratified Pesicka's activity would be difficult to sustain, we need not reach this issue. For it is clear that, whatever the scope of Angle's express authorization or direction of Pesicka's activity, as a matter of law Angle is responsible. We long ago reiterated, in accordance with section 2(13) of the Act, 29 U.S.C. § 152(13) (1970), that strict principles of agency law do not apply in determining the liability of an employer, and proceeded to note that "we agree with the Board that an employer may properly be held responsible for 'interfering' in the affairs of a union because of participation by his supervisors even though such participation was not expressly authorized or ratified." Local 636, Plumbers v. NLRB, 109 U.S.App.D.C. 315, 287 F.2d 354, 359-60 (1961), citing International Ass'n of Machinists v. NLRB, 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. 50 (1940), and H. J. Heinz Co. v. NLRB, 311 U.S. 514, 521, 61 S.Ct. 320, 85 L.Ed. 309 (1941). Other courts, echoing this commonplace position, have indicated that the test of the employer's responsibility for acts of one of his supervisors is whether " 'employees would have just cause to believe that he was acting for and on behalf of the company.' " Irving Air Chute Co. v. NLRB, 350 F.2d 176, 179 (2d Cir. 1965), quoting NLRB v. Texas Ind. Oil Co., 232 F.2d 447, 450 (9th Cir. 1956).
 
 
 37
 Respondent has suggested that stricter rules govern an employer's liability in civil contempt, although he conceded at oral argument that he could provide no authority to support this suggestion. The proposition appears to us to be merely a variant of the broader contention that lack of wilfulness prevents an adjudication in civil contempt, a view we have already rejected. In the context before us, we derive guidance from NLRB v. Crown Laundry & Dry Cleaners, Inc., 437 F.2d 290, 293 (5th Cir. 1971), in which the court found an employer in civil contempt for conduct of a supervisor, even accepting as true the company's allegations that it took substantial steps to insure that its supervisory personnel would not violate the court's order and that the violations were committed by the lowest ranking supervisor at the plant, were not extensive, and were in violation of the instructions of the President of the company.
 
 
 38
 We need not decide whether we would go as far as the court in Crown Laundry. For here Pesicka was the highest ranking management official at the plant, Tr. at 92; Petitioner's Exh. 2; rather than repudiating Pesicka's authority, Angle had reaffirmed it, Petitioner's Exhs. 2, 13; and the evidence suggests that there was in fact authorization and ratification by Angle of Pesicka's activities, see Tr. at 293, 463-65, 511-12, rather than a direction to desist from such conduct. In these circumstances, there can be little doubt that employees would reasonably attribute the activities of Pesicka to Angle and that Angle never made a sufficient effort to ensure Pesicka's compliance with the Court's order.[9] We conclude, therefore, that insofar as the Master's report exonerated Angle from liability for coercive activities of Pesicka, it rested upon an erroneous conception of law, and its findings cannot be adopted. Rather, in determining whether Angle is in contempt of this court's order, we are compelled to attribute to him declarations and conduct of Pesicka.
 
 
 39
 B. Liability for Individual Incidents.
 
 
 40
 1. Pesicka's Attendance at a Union Meeting.
 
 
 41
 The Master found that "(t)here is evidence that the plant superintendent, Pesicka, attended one union meeting," Master's Report at 21, an understated manner of summarizing the uncontroverted testimony on this point, see Tr. at 463, 1053-54. Respondent offers no reason for Pesicka's attendance but only the lame suggestion that Pesicka did not know that the meeting was exclusively for employees, id. at 463. The uncontroverted testimony of the results of his surveillance illustrates clearly why such surveillance has been held to constitute restraint and coercion of employees in the exercise of their Section 7 rights. An AFL-CIO representative asked Pesicka to leave after having been told of Pesicka's position and that employees were "dummying up" because of his presence. Id. at 1053-55. Pesicka left the hall but stayed on the grass nearby the building until the meeting ended, id., and later reported to Angle the identity of those employees who had attended the meeting and what transpired, id. at 291-92, 463-64.
 
 
 42
 Where the only apparent purpose of such presence at a union meeting is to keep an eye on what was happening and to report to the company owner, employees are likely to fear not without reason that reprisals for pro-union activity may take place. It is not surprising that the courts have consistently upheld NLRB findings that such activity constitutes prohibited coercion. E. g., NLRB v. Rex Disposables, 494 F.2d 588, 593 (5th Cir. 1974) (mere presence of supervisor in a car in parking lot near site of union meeting an unfair labor practice); NLRB v. Speed Queen, 469 F.2d 189, 191 (8th Cir. 1972) (same); NLRB v. Shurtenda Steaks, Inc., 397 F.2d 939, 944, 946 (10th Cir. 1968) (attempt of foremen, who had transported employees to union meeting, to enter union headquarters was "plainly an attempt at surveillance and was a violation of the Act"); Filler Prods., Inc. v. NLRB, 376 F.2d 369, 374 (4th Cir. 1967) (unexplained presence of company president near union meeting combines with other circumstances to support a finding of surveillance). As was stated in Hendrix Mfg. Co. v. NLRB, 321 F.2d 100, 104-05 n. 7 (5th Cir. 1963), "surveillance becomes illegal because it indicates an employer's opposition to unionization . . .. (T)he law reasons that when the employer either engages in surveillance or takes steps leading his employees to think it is going on, they are under the threat of economic coercion, retaliation, etc." With respondent unable to offer any justification for Pesicka's attendance, it is clear beyond doubt that such activity was coercive and in violation of this court's judgment.[10]
 
 
 43
 2. Pesicka's Alleged Statements that Angle "Would Rather Go to Jail than Sign a Union Contract."
 
 
 44
 The Master found that Angle never said he would "rather go to jail than sign a union contract," but, again with understatement, noted that
 
 
 45
 (t)here is some evidence that Pesicka told one of the employees that in his opinion Angle would rather go to jail than sign a union contract. Tp. 543-44. This was merely the expression of a personal opinion, not authorized or directed by Angle, and Angle specifically denied that this was his position when questioned as to Pesicka's statement by the same employee. Tp. 561-64.
 
 
 46
 Master's Report at 21.
 
 
 47
 It appears from the record that Pesicka made a statement of this sort on two separate occasions. The first, to which the Master referred, took place when Pesicka accosted employee Elsen and asked whether he planned to attend the union meeting, and responded to Elsen's affirmative answer by suggesting that he did not think joining a union would make much of a difference. Pesicka also stated that if the employees joined the union and went on strike, they would be walking on the highway with the picket signs forever, adding either that Angle said he would go to jail, or merely that Angle would go to jail, before he would sign a contract. Tr. at 539-44.
 
 
 48
 On another occasion, Pesicka expressed similar sentiments to Elsen and employees Luft and Brack, stating that the Board was becoming fed up with and was about to drop "the whole thing," that the employees could never "whip" Angle because he was too strong, did not need to operate the KRH plant, and "would never sign a union contract." Tr. at 591-92[11] Although Brack's testimony about this conversation appears to have been uncontroverted, the Master omitted mention of it in his findings. We find no reason, however, to so discredit Brack's testimony as to find that this second conversation did not take place.
 
 
 49
 The coercive effect of these statements could hardly be plainer. See, e. g., NLRB v. Gissel Packing Co., 395 U.S. 575, 616-20, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); NLRB v. Varo, Inc., 425 F.2d 293, 299 (5th Cir. 1970); International Union, United Automobile, Aerospace & Agric. Implement Wkrs. v. NLRB, 129 U.S.App.D.C. 196, 392 F.2d 801, 806 (1967), cert. denied, 392 U.S. 906, 88 S.Ct. 2058, 20 L.Ed.2d 1364 (1968); Bakery Workers v. NLRB, 76 L.R.R.M. 2560 (D.C.Cir. 1971) (per curiam), enf'g in relevant part 171 N.L.R.B. 700 (1968); International Union of Electrical, Radio & Mach. Wkrs. v. NLRB, 127 U.S.App.D.C. 303, 383 F.2d 230 (1967), enf'g in relevant part 159 N.L.R.B. 1795, 1797-98 (1966), cert. denied, 390 U.S. 904, 88 S.Ct. 818, 19 L.Ed.2d 871 (1968). Rather than arguing otherwise, respondent hinges his argument on the Master's observation that Angle later told Elsen that he would sign a union contract. See Tr. at 561-63. However, that sentiment was never communicated to Luft and Brack and thus cannot cure the coercive effect of Pesicka's statement to them.[12] We thus find ourselves compelled to reject the Master's findings because (1) they fail to note the apparently uncontroverted fact that the second conversation with Luft, Brack and Elsen took place, and (2) they once again rest upon an erroneous view of the law respecting Angle's liability for Pesicka's statements.
 
 
 50
 3. Angle's Notation on the Posted Notice Required by NLRB Order.
 
 
 51
 The Master's findings regarding this incident were as follows:
 
 
 52
 On February 16, 1972 Angle posted at the KRH plant the notice required by the Board and by the order of this Court indicating that he would cease and desist from the practices found to have been violative of the act. The notice (Board's Exhibit 50) included the statement, "I will not grant wage increases to discourage employees from adherence to, or activities in behalf of, the above Union, or any other labor organization but nothing in the preliminary decision of the trial examiner requires that I rescind or cancel any wage increase or other benefits heretofore granted." In July, 1972 Angle underlined the words of that paragraph, "I will not grant wage increases" and added in the margin of the notice the handprinted words "U.S. Gov't NLRB has this court order. Angle can not give any KRH employee a raise in salary." Tp. 350. He left the notice with the marginal note posted at the plant up to the time of the hearing. His action in so doing was ill advised and not calculated to restore good relationship with his employees but, the sixty-day posting period having elapsed, was not violative of the Court's order.
 
 
 53
 Master's Report at 22.
 
 
 54
 The Board excepts to this finding on the ground that the Master misconstrued the thrust of the allegation of contempt. The Board argues not that respondent failed to comply with the posting requirements of the order, but rather than the notation was itself a coercive statement by Angle that violated the part of the order prohibiting restraint or coercion of employee rights. The Board notes properly, we think that the refusal to grant any wage increases goes far beyond a prohibition of discriminatory increases. The Master made no finding regarding this theory, but in this instance that need not prevent us from supplementing his findings. He found that the notation was made a fact not really controverted and, once again, the coercive effect of the statement could hardly be clearer, as it denigrates the Board's remedial mechanism and threatens to withhold benefits because of union activity. See, e. g., International Union, U. A. A. & A. W. v. NLRB, supra, at 805-06; International Union of Electrical, Radio and Mach. Workers v. NLRB, supra, enf'g in relevant part 159 N.L.R.B. 1795, 1797-98 (1966), cert. denied, 390 U.S. 904, 88 S.Ct. 818, 19 L.Ed.2d 871 (1968). We thus find this notation to have been contemptuous.[13]
 
 
 55
 IV. RODGERS' REINSTATEMENT.
 
 
 56
 The Board decisions and orders which this court enforced found Angle's two discharges of employee Rodgers to have been illegal and required his reinstatement.[14] The Board's exceptions to the Master's finding that respondent did not violate this court's judgment outline two distinct aspects of Angle's alleged contumacy, which we consider independently.
 
 
 57
 A. Was Rodgers Reinstated to the Proper Position?
 
 
 58
 The Master's findings as to whether Rodgers was restored to the appropriate job classification were as follows:
 
 
 59
 A. During Rodgers' earlier employment at KRH and at the time of his discharge, the plant's operations were conducted by one "senior operator" and two "junior operators" on each shift, with no other on-site supervision. Rodgers' position was described as "senior operator" and his pay was $3.75 per hour. Angle maintained before the Board that Rodgers was a supervisory employee within the meaning of the Act. On the basis of Rodgers' testimony that he exercised no supervisory functions, the Board, sustained by this court, decided that Rodgers was not a supervisory employee.
 
 
 60
 B. During Rodgers' first period of employment it was Angle's belief that the "senior operators," including Rodgers, were supervisors and he looked to each of them, while on duty, to supervise the work of the other employees on his shift. After the decision that the "senior operators" were not supervisors, Angle, in order to provide constant supervision of the plant and its operations, tried various organization plans culminating in the one in effect at the time that Rodgers was reinstated. Under this plan, the plant superintendent was in charge of all operations and an "Operations Manager" was in charge of each shift, four in all. (Other supervisory positions were designated as managers of maintenance, instruments, office and inventory). The superintendent and all managers exercised supervisory functions. The superintendent and the managers together constituted a supervisory level above the positions theretofore labeled "Senior Operators" and these positions, previously designated as "Senior Operators," became "Chief Operators." At the nonsupervisory level in plant operations there was a "Chief Operator" on each shift, together with three or four other plant employees. The highest nonsupervisory position in the organization was that of Chief Operator and, when Rodgers was reinstated it was to that position. The hourly wage for that position being $3.70 per hour (sic).
 
 
 61
 Master's Report at 9-10.
 
 
 62
 We are in agreement with the Board that the Master's findings appear implicitly to rest upon an erroneous conception of the law. For it is not the law that an employee who is illegally discharged and who, but for that discharge, would have been promoted to a supervisory position, does not have to be reinstated to a supervisory position. Rather, the governing standard was stated long ago in NLRB v. Bell Aircraft Corp., 206 F.2d 235, 237 (2d Cir. 1953):
 
 
 63
 At the time the discrimination took place (Rodgers) was clearly a protected employee, and his prospects for promotion were among the conditions of his employment. The Act protected him so long as he held a nonsupervisory position, and it is immaterial that the protection thereby afforded was calculated to enable him to obtain a position in which he would no longer be protected.
 
 
 64
 The reasoning in Bell Aircraft was approved, in a somewhat different context, by the Ninth Circuit in Golden State Bottling Co. v. NLRB, 467 F.2d 164, 166 (9th Cir. 1972):[15]
 
 
 65
 The Act's remedies are not thwarted by the fact that an employee who is within the Act's protections when the discrimination occurs would have been promoted or transferred to a position not covered by the Act if he had not been discriminated against. NLRB v. Bell Aircraft Corp., 206 F.2d 235, 236-237 (2d Cir. 1953).
 
 
 66
 In affirming the Ninth Circuit's decision, the Supreme Court quoted and explicitly approved the very passage quoted above. See 414 U.S. 168 at 188, 94 S.Ct. 414, 38 L.Ed.2d 388.[16]
 
 
 67
 The question then raised is whether Rodgers would have become an Operations Manager but for his illegal discharge. We are handicapped by the Master's failure to make findings on this issue, but we believe the record is clear enough to enable us to make that determination ourselves. All of the employees who were formerly Senior Operators and only those employees were promoted to Operations Manager. Tr. at 105-06. Two of these four were also employed in 1966 when Rodgers was a Senior Operator, and at the time of Rodgers' discharge in 1967 they were being paid at the same rate as Rodgers. On the other hand, the position of Chief Operator to which Rodgers was restored was otherwise filled by employees who, before the reorganization, had been either Assistant Senior Operators (also called Junior Operators) or ordinary employees. Tr. at 110-12; Respondent's Exh. MM; Petitioner's Exh. 12.
 
 
 68
 The only reason that respondent offers for the proposition that Rodgers would not have become an Operations Manager is the vague assertion that he was not qualified, cooperative, or honest. That assertion rings hollow in light of (1) the Board's twice having rejected that very argument as a pretext when presented in connection with the 1966 and 1967 discharges of Rodgers, see 176 N.L.R.B. No. 115, slip op. at 23; 176 N.L.R.B. 1037, 1039, 1042; (2) Rodgers' having been employed in 1966 and reinstated in 1967 as a Senior Operator, a position that Angle contended was supervisory, (3) the depth of Angle's longstanding and uncontroverted dislike of Rodgers, a union ringleader, and (4) the long history of Angle's anti-union animus.
 
 
 69
 Upon consideration of all of this undisputed evidence, we are left with the "definite and firm conviction" that Rodgers would have become an Operations Manager but for his illegal discharge. In this circumstance, the lack of an explicit finding on this question by the Master does not prevent us from holding that, under the legal standard of Bell Aircraft, Angle must be found in civil contempt of this court.
 
 
 70
 B. Was Rodgers Subjected to Burdensome Working Conditions in his Position as Chief Operator?
 
 
 71
 In light of our ruling that Rodgers should have been reinstated as an Operations Manager, we think it superfluous to discuss whether to adopt the Master's findings, see Master's Report at 10-13, rejecting the Board's allegation that Rodgers' reinstatement as a Chief Operator was defective because of the failure to assign him the full responsibilities of the lower position. In order to provide respondent with guidance for compliance with our order, we note our skepticism about the cogency of the Master's findings: in the event an individual is not fully equipped to perform a job due to his absence therefrom during an illegal discharge, it is the employer's obligation to take the initiative in retraining him as expeditiously as possible; the employer also bears responsibility for ensuring that those who immediately supervise the reinstated individual also take such initiative; that a training period substantially longer than that served by other new employees is suspect absent special explanation; and that allegedly inadequate performance is a dubious justification for a lengthy training period if no effort has been made to eliminate the inadequacy or even to communicate it to the individual.
 
 
 72
 V. ALLEGED ILLEGAL DISCHARGES.
 
 
 73
 Petitioner finally alleges that three episodes resulting in the discharge of four employees violated the court's judgment barring discriminatory discharges. We consider these in turn, each in light of the accepted principle that a discharge is illegal if motivated in any part by anti-union animus. See, e. g., Ridgely Mfg. Co. v. NLRB, 166 U.S.App.D.C. 232, 510 F.2d 185, 186 (1975) (per curiam); Local 152, Teamsters v. NLRB,120 U.S.App.D.C. 25, 343 F.2d 307, 308-09 (1965).A. The Discharge of Arel Rodgers and Hilary Luft.
 
 
 74
 The Master's findings of the facts surrounding this discharge were as follows:
 
 
 75
 A. On July 11, 1972, Hilary Luft was involved in an altercation with one Wagner, a fellow employee, on company premises and on company time. Angle suspended both men and arranged for Pesicka to hold a conference with them on July 12, 1972, for the purpose of reinstating them with a warning of dismissal if there should be fighting on company time. Luft was advised by Pesicka of his reinstatement before the conference. Rodgers, without any request from Luft, and having knowledge that Luft was to be reinstated, persuaded Luft to insist that at the conference Luft be represented by Rodgers, acting as a union steward or union representative. At that time there was no contract with the union and no grievance procedures had been established. Neither Angle or Pesicka had any notice of any claim by Rodgers or by anyone that Rodgers was a union steward. Luft and Rodgers appeared together at the KRH office on July 12th and insisted on Rodgers' attendance at the conference, to the point of a physical struggle between Rodgers and Wagner. Both Luft and Rodgers were discharged for insubordination.
 
 
 76
 B. Luft and Rodgers unreasonably insisted upon Rodgers' attendance at the conference since both knew that no further disciplinary action was contemplated. Their conduct warranted their discharge.
 
 
 77
 Master's Report at 13-14.
 
 
 78
 These findings relate to the Supreme Court's decision in NLRB v. J. Weingarten, Inc., 420 U.S. 251, 95 S.Ct. 959, 963, 43 L.Ed.2d 171 (1975). In that case, the Court affirmed an NLRB decision that " § 7 creates a statutory right in an employee to refuse to submit without union representation to an interview which he reasonably fears may result in his discipline . . .." Id. at 256.
 
 
 79
 The Master's exoneration of Angle on this score appears to rest upon two reasons for finding Weingarten inapplicable: first, that both employees knew that no further disciplinary action was contemplated, and second, that there was no contract or grievance procedure, nor any notice that Rodgers claimed to be a union steward. We believe, however, that neither of these distinctions is sustainable.
 
 
 80
 We are unable, in light of record evidence not referred to by the Master, to uphold his finding that Luft could not reasonably believe that discipline would be imposed. There is no dispute that, as the Master found, Luft had been informed that his suspension would be lifted at the scheduled meeting. The Master's report, however, fails to consider testimony in the record that was uncontroverted and not specifically discredited, describing subsequent events, at the outset of the meeting itself, that we believe gave rise to a reasonable belief that discipline might be imposed. When the two employees arrived for the meeting, Pesicka inquired why Rodgers was present, and when informed that he intended to act as a steward or representative, Pesicka replied that there was no need since there was neither a union nor a contract. Tr. at 509-09, 755, 798, 1063. Pesicka then told Luft he would be reinstated but that there was to be no more fighting. Tr. at 1063. Luft then stated "if that's all you have to tell me then, thank you, and I'll see you this evening then." Id. But Pesicka replied "no, no, there's something else I have to tell you." Id. at 754-55, 1063, 1228-29.
 
 
 81
 That something else was not revealed, nor, when Luft then reiterated his insistence upon Rodgers' presence, did Pesicka indicate that representation was unnecessary because no discipline would result. Instead, Pesicka decided to call Angle in Wichita, and after hearing of Luft's insistence that Rodgers represent him, Angle told Luft that he had initially thought of suspending him for a couple of weeks, but because he insisted on having Rodgers hold "his damn hand," they would both be discharged. Id. at 757, 1065.
 
 
 82
 Angle's own statement and the fact that Wagner the other employee in the altercation was reinstated after one day, id. at 1065, leave little room for doubt that the reason for the discharges was the insistence upon representation at the meeting. And we believe that in light of Pesicka's statement not discussed by the Master that there was "something else" he wished to say to Luft, a finding that an employee might not reasonably fear discipline in those circumstances was clearly erroneous. That statement superseded any earlier understanding Luft might have had that no discipline would be forthcoming; and no one disputes that Luft's conduct in the altercation was of the kind for which discipline is thought appropriate. In addition, the statement immediately followed, and contrasted in tone with, Pesicka's indication that the suspensions would be lifted, i. e., that no discipline would be imposed.
 
 
 83
 Indeed, it is hard to see what Luft should have reasonably believed the purpose of the scheduled meeting was if discipline was out of the question, particularly since Pesicka never indicated that no discipline would be imposed and hence no representation would be needed. Plainly, the words in question are far too imprecise to suggest clearly that the "something else" was the possibility of future discipline; by the same token, they are far too imprecise to dispel all reasonable fears that discipline might result.[17] Particularly in view of the Master's failure to consider explicitly what we believe to be the critical testimony, we find ourselves forced to reject as clearly erroneous his finding that Luft could not reasonably fear the imposition of discipline.[18]
 
 
 84
 The second reason implicitly relied upon by the Master in his finding of no contempt that Rodgers did not represent a union in connection with an established grievance mechanism can be disposed of more easily. As even the dissenters in Weingarten realized, see 420 U.S. at 270 n.1, 95 S.Ct. 959 (Powell, J., dissenting), that decision's elaboration of Section 7 protects the right to act in concert, not merely the right to act in concert with a recognized union. See generally NLRB v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962).
 
 
 85
 We thus find respondent in civil contempt for the discharges of Luft and Rodgers.[19]B. The Discharge of Brian Brack.
 
 
 86
 The Master explained Brack's discharge as follows:
 
 
 87
 C. On August 14, 1972 (although the testimony as to the date is conflicting, I find the date to be August 14, 1972) Brack was assigned the duty of taking and recording the reading of the gauges on the various compressors at the plant, the readings to be taken hourly. This duty was vitally important to the safe and efficient operation of the plant. For one period of at least two hours Brack remained continuously in the control room and for another period of at least one-half hour he remained continuously in the maintenance shop. No compressors were located in either the control room or the maintenance shop.
 
 
 88
 D. Pesicka reported to Angle Brack's non-attention of duties. Angle investigated, believed the report to be true, and discharged Brack for nonperformance of assigned duties.
 
 
 89
 E. Brack's discharge was justified and proper.
 
 
 90
 Master's Report at 14.
 
 
 91
 This finding has evidentiary support. Pesicka stated unequivocally that he had seen Brack in the control room for a continuous two-hour period, and in the maintenance room for another thirty minutes. Tr. at 514-16. This testimony was corroborated by Brack's own admission that he was delinquent. Id. at 670. A transcript of the telephone conversation at the end of which Brack was discharged reveals that Angle was genuinely, and properly, concerned with the serious damage to the plant that a failure to take compressor readings could cause. Unlike many of Angle's other conversations or statements, this conversation is not laced with antiunion declarations, nor does it indicate an inability to accept the legitimacy of union activity. Petitioner's Exh. 37. The fact that an employer has exhibited antiunion bias in some circumstances does not necessarily mean that every discharge of a union adherent is illegal, and upon reviewing the record we find no basis for holding the Master's finding to be clearly erroneous.
 
 
 92
 C. The Discharge of Harold Straub.
 
 
 93
 The Master explained Straub's discharge as follows:
 
 
 94
 F. On November 16, 1972 Straub informed Pesicka that he had been advised by a physician that he should change jobs for health reasons. Pesicka reported the statement to Angle, who undertook an investigation by writing letters to Straub and to two physicians known by him to have treated Straub in the past. Straub did not respond to Angle's inquiries and the responses of the two physicians were to the effect that neither had advised Straub to change jobs.
 
 
 95
 G. Straub did not testify before the Master but in a deposition taken in this proceeding and received in evidence, he admitted that the statement he had made to Pesicka on November 16, 1972 to the effect that he had received medical advice to change jobs was false. Straub knew that the letter from Angle, dated November 28, 1972, was precipitated by his statement to Pesicka but he took no steps to deny, correct or explain the false statement.
 
 
 96
 H. There is no evidence that Straub was coercively interrogated about union activities as alleged by the Board. Pesicka denied that he had warned Straub not to become involved in union negotiations, as alleged by the Board. Straub did not take the witness stand to contradict Pesicka's testimony and I find that Pesicka's uncontroverted testimony should be credited.
 
 
 97
 I. I find the Straub was terminated for failing to respond to legitimate requests for information by his employer; that he made an admittedly false statement which he took no steps to deny, correct or explain. His discharge was justified and proper.
 
 
 98
 Master's Report at 14-15.
 
 
 99
 The Board argues that this finding is clearly erroneous when measured against largely undisputed evidence in the record. In mid-August, 1972, Straub joined the union bargaining committee, and Angle knew that he had been attending bargaining meetings, Tr. at 326. On November 14, 1972, Straub and Pesicka engaged in a conversation which was described somewhat differently in various testimony; but what is important in determining the motivation for the discharge is that on November 16, Pesicka sent Angle the following report:
 
 
 100
 I got Harold Straub in a little conversation. he (sic) has been having health problems, & the doctor said it was his job & advised him to change jobs.
 
 
 101
 I asked him what he was worried about. he (sic) said their (sic) is going to be a big shake down here & George Angle was going to be in real trouble from the Feds. I said how come & he said for firing men for union activities, & for Angles (sic) actions against the men. I asked him who told him all this & he said Rodgers did.
 
 
 102
 he (sic) said he had given the Feds. some statements & he was scared of what our lawyers would do to him on the stand he wasn't sure what he had said to them.
 
 
 103
 I think they are using him cause you can talk him into anything. if (sic) you tell him he looks sick, 1 hr. later he is.
 
 
 104
 Petitioner's Exh. 49; see Tr. at 492.
 
 
 105
 On November 27, Straub attended another bargaining meeting and spoke in favor of a seniority provision to prevent favoritism, emphasizing that sons of both Angle and Pesicka were employed at the plant. Straub responded to the company's argument that seniority might place unqualified personnel in positions they could not handle by stating that he thought there were only two people at the plant who could not learn his job as Chief Operator within thirty days. Tr. at 1254-56, 1515-16. On November 28, Angle wrote Straub, expressing great concern for his physical and mental health in view of Straub's statement that he was advised by a doctor to consider changing his job. The letter also stated: "Mr. Straub, as I understand it, your health condition may involve mental problems brought about in part by statements you have signed in the past." Angle concluded by suspending Straub from work until he had been examined by his doctors and Straub was advised that the company was satisfied with the medical reports. Petitioner's Exh. 38.
 
 
 106
 Straub was examined by one physician on November 29, and on November 30 Angle received a letter from him finding Straub's mental and physical condition to be fine and describing Straub as employable without reservation. Petitioner's Exh. 41.
 
 
 107
 Angle immediately wrote Straub, stating that the doctor was not the one who advised Straub that he should consider quitting, and asking him to consult the other doctors he had been going to. Petitioner's Exh. 42. Four days later, on December 4, Angle again wrote Straub, reiterating what was said in the November 30 letter and further stating that "whatever problems you have are more nervous or mental problems instead of physical." Angle indicated that the principal bases for that judgment were (1) Straub's having called the plant on November 28th before picking up his paycheck to ensure he was not barred from the premises, and (2) his statements at the November 27 bargaining meeting that all but two KRH employees could learn his job within 30 days, that seniority was needed to prevent favoritism, and that he was nervous working under Pesicka's supervision when his relatives were also working at the plant. Petitioner's Exh. 43; see Tr. at 1515-16.
 
 
 108
 A letter dated December 2 from another physician to Angle confirmed the lack of any mental or physical condition. Petitioner's Exh. 44. Angle, still not satisfied, sent Straub a questionnaire about his condition, which included an inquiry, without apparent foundation, as to whether "(t)he pressure of your job and your nervousness has caused your wife concern." Petitioner's Exh. 45.
 
 
 109
 One week later, on December 20, Angle wrote Straub again insisting that he complete the questionnaire. Straub evidently communicated with the Board, and on December 21 a Board attorney wrote Angle's attorney, expressing his view that the purpose of the questionnaire was to harass Straub because of his union activity, and indicating that the Board had advised Straub he need not complete it. Petitioner's Exh. 48. On December 26, Angle dismissed Straub by letter, noting that the copy of the Board's letter to Angle's attorney "is further evidence that confirms everything I have written to you earlier today," and that "You did not intend to answer my letters of December 13 or December 20th. You further had no intention of returning to work, you simply called the NLRB in Kansas City/Washington, D. C. to ask them to add additional charges against George Angle in your behalf." Petitioner's Exh. 47.
 
 
 110
 Were we reviewing a finding that Straub's discharge was legal by the NLRB in an unfair labor practice proceeding, we conceivably might feel compelled to defer to the Board's expertise. But in reviewing a Master's finding, where less deference is required, see, e. g., note 3 supra, we believe we must reach a contrary finding and reject that of the Master as clearly erroneous. To begin with, the Master explains Straub's discharge in part by finding that his statement to Pesicka on November 14 that he had been advised to change jobs was false, and he made no attempt to explain or correct it. However, respondent points us to no evidence, and we have found none, to indicate, assuming the statement to have been false, see Tr. at 1525-26, that Angle was aware of or relied upon the falsity in deciding to discharge Straub. Thus, the only possible legitimate motivation for Straub's discharge is concern about his health and his failure to respond to Angle's request for information. The former seems implausible in light of (1) Angle's having been told independently by two doctors that Straub was fine, (2) the lack of any evidence in the record that Straub had any condition that had in the past impaired his work performance, (3) Angle's reliance in his letters of November 28, December 4, and December 26 on Straub's signing statements for NLRB proceedings, his views on seniority expressed at bargaining, or his communicating with the Board in December as indicative of a mental problem, and (4) Angle's knowledge that Straub was suggestible in connection with his health. And if the concern for Straub's health seems to be a sham, so too must the failure to complete a questionnaire investigating Straub's alleged health problems.
 
 
 111
 The evidence just mentioned not only refutes the Master's findings as to why Straub was discharged, but points to antiunion animus as the reason. Angle's inability to separate alleged psychological problems from union activities and his unwillingness to accept the opinions of two physicians selected by himself indicates that Straub's discharge cannot be considered in sterile isolation from Angle's unyielding opposition to unionization. Straub was known by Angle to be an active union supporter. And it is surely highly probative that Straub was first suspended not shortly after November 18, when Angle first received Pesicka's report, but rather one day after November 27, the day on which Straub discussed seniority provisions at a bargaining session a discussion to which Angle twice referred in his subsequent correspondence with Straub. The very strong evidence in the record not considered by the Master that Angle was motivated by improper motives, and the highly implausible nature of the explanation offered by respondent and the Master for Straub's discharge, lead us to reject the Master's finding as clearly erroneous and to find Straub's discharge to be illegal.
 
 
 112
 VI. CONCLUSION.
 
 
 113
 Although ten years have gone by since charges of unfair labor practices at KRH were first made, respondent's opposition to and interference with the right of his employees to unionize appears to be no less stubborn. The violations of the National Labor Relations Act are not only persistent, but they also flagrantly contravene the national labor regulatory policies enunciated by the Congress. The order we issue today is designed to remedy past, and to prevent future, noncompliance.
 
 ORDER
 
 114
 Wherefore, in accordance with the foregoing opinion, IT IS ORDERED THAT:
 
 
 115
 1. George A. Angle is hereby found in civil contempt of this court.
 
 
 116
 2. Respondent may purge himself of contempt by
 
 
 117
 (a) Fully complying with and obeying the said judgment of this court, and each of the provisions of the board orders thereby enforced.
 
 
 118
 (b) Refraining from instituting changes in any term of employment without providing the Union with notice and a reasonable opportunity to bargain about such changes.
 
 
 119
 (c) Making employees whole, after supplemental proceedings have been held by the Board to fix the amount necessary to reimburse the employees for any losses they may have suffered by virtue of any increased insurance premiums resulting from the employer's unilateral change in insurance coverage or plans, and any diminution in earnings resulting from the employer's unilateral change in the plant job and wage structure and classifications, subject to review by this court.
 
 
 120
 (d) Offering immediate and full reinstatement to Harold Straub to his former or substantially equivalent position, without prejudice to his seniority and other rights and privileges; and making Straub, Arel Rodgers, and Hilary Luft whole, after supplemental proceedings have been held by the Board to fix the amount necessary to reimburse them for any loss they may have suffered by reason of respondent's failure to comply with the decree, subject to review by this court.(e) Preserving and making available to the Board upon request, for examination and copying, all the Company's correspondence, books, records and other documents necessary or useful to determine the amounts due to make whole the employees as set forth in paragraphs 2(c) and 2(d).
 
 
 121
 (f) Refraining from imposing any undue and burdensome conditions upon Straub upon his reinstatement.
 
 
 122
 (g) Refraining from discriminatorily applying work rules against Straub after his reinstatement to discourage participation in protected activities.
 
 
 123
 (h) Refraining from engaging in surveillance of Union meetings; stating that the employer will never sign a contract with the union; threatening to go out of business or close the plant on account of the union; stating that employees will not receive raises on account of the union; seeking to discourage resort to the Board's processes; denigrating the efficacy of Board orders; coercively interrogating employees about their union activities and sympathies and the union activities and sympathies of their fellow employees; threatening that collective bargaining would be futile; threatening the employees with violence on account of their union activities; warning employees not to get involved in the collective bargaining negotiations; defacing or permitting defacement of posted Board orders or in any other manner interfering with, restraining or coercing employees in the exercise of their rights as guaranteed by Section 7 of the Act.
 
 
 124
 (i) Immediately posting in conspicuous places, including all places where notices to employees are customarily posted, for a period of sixty (60) consecutive days, copies of the contempt adjudication and of a notice in the form prescribed by the Board and signed by George A. Angle which states that Angle has been adjudicated in civil contempt of court for failing and refusing to comply with the decree of this court and that he will take the action in purgation ordered by the court. Said notices and copies of the contempt adjudication shall be maintained in clearly legible condition throughout such posting period and Angle shall assure that they are not altered, defaced or covered by any other material.
 
 
 125
 (j) Immediately mailing to each of his current employees and all former employees who were employed by him since the entry of the court's decree on September 10, 1971, a copy of the aforesaid signed notice and of the contempt adjudication; and providing the Board's Regional Director with proof of such mailing.
 
 
 126
 (k) Filing sworn statements with the Clerk of this court, and a copy thereof with the Director of the Seventeenth Region of the Board, within ten (10) days after the entry of adjudication and again at the end of the posting period, showing what steps have been taken by Angle to comply with the court's directions.
 
 
 127
 (l) Reimbursing the Board for all costs and expenditures, including reasonable counsel fees, incurred by the Board in the investigation, preparation, presentation and final disposition of this proceeding.
 
 
 128
 (m) Within thirty (30) days of the date of this order, assembling all the employees in the plant upon at least five (5) days notice and in the presence of all such employees instructing their supervisors to comply with the provisions of the Board's orders as enforced by the court's decree, prohibiting coercive interrogation, threats, discriminatory discharges or suspension, discriminatory terms and conditions of employment, oppressive terms and conditions of employment, surveillance or any other interference, restraint or coercion to discourage exercise by employees of their rights as guaranteed by Section 7 of the Act.
 
 
 129
 (n) Upon request of the Union made within six (6) months of the adjudication, immediately granting the Union and its representatives reasonable access for a one-year period to company bulletin boards and all places where notices to employees are customarily posted.
 
 
 130
 3. For the purpose of assuring compliance with the provisions of this order, this court hereby imposes a compliance fine against respondent of $6,000.00 for each and every violation of the foregoing provisions, and a further compliance fine of $1,000.00 per day for each and every day that such violation continues. The court reserves jurisdiction to issue writs of attachment, to take other appropriate action against respondent, and to amend this order or issue such additional orders as it deems appropriate.
 
 
 
 *
 Sitting by designation pursuant to Title 28 U.S.Code Section 294(c)
 
 
 [1]
 While those charges were pending, the Regional Director of the Board obtained from the United States District Court in Kansas an injunction under § 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j) (1970), which directed, inter alia, the reinstatement of six discharged employees pending a decision by the Board. Sacks v. Angle, 55 CCH Lab.Cas. P 11,865 (D.Kan.1967). Doubts about the extent of compliance with that order led to civil and criminal contempt proceedings. The former were dismissed after the Tenth Circuit modified that part of the order dealing with temporary reinstatement, Angle v. Sacks, 382 F.2d 655, 661 (10th Cir. 1967); and the criminal matter was also ultimately dismissed
 
 
 [2]
 On September 12, 1972, this court granted the Board's motion for temporary relief and ordered that the suspensions or discharges of employees Arel Rodgers and Hilary Luft be withdrawn and that they be reinstated with full privileges. On February 14, 1973, this court granted the Board's motion seeking the identical relief in regard to the discharges of employees Brian Brack and Harold Straub
 
 
 [3]
 In considering the meaning of this standard, we are mindful of Judge Learned Hand's observation that
 It is idle to try to define the meaning of the phrase, "clearly erroneous"; all that can be profitably said is that an appellate court, though it will hesitate less to reverse the findings of a judge than that of an administrative tribunal or of a jury, will nevertheless reverse it most reluctantly and only when well persuaded.
 United States v. Aluminum Co. of America, 148 F.2d 416, 433 (2d Cir. 1945).
 
 
 [4]
 The Board asserts in its brief at 31-32 that a master's inferences, deductions and conclusions of law are entitled to no special weight, citing in support of that proposition D.M.W. Contract Co. v. Stolz, 81 U.S.App.D.C. 334, 158 F.2d 405, 407 (1946), cert. denied, 330 U.S. 839, 67 S.Ct. 980, 91 L.Ed. 1286 (1947), as well as several cases in other circuits and a well-known treatise. As respects inferences and deductions from even undisputed facts, D.W.R. Contracting Co. provides no, and the other authorities provide only tenuous, support for that assertion. Perhaps more important, the Board failed to cite more recent authority in both this circuit, see Case v. Morrisette, supra, at 1307, and the Supreme Court, see cases cited id. n. 34, that clearly take a contrary view of the "clearly erroneous" standard. We expect a more responsible attention to legal research, especially from a party seeking the extraordinary relief of a contempt adjudication
 
 
 [5]
 See McComb v. Jacksonville Paper Co., 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949):
 The absence of wilfulness does not relieve from civil contempt. Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance. (Citations omitted). Since the purpose is remedial, it matters not with what intent the defendants did the prohibited act. The decree was not fashioned so as to grant or withhold its benefits dependent on the state of mind of respondents. It laid on them a duty to obey specified provisions of the statute. An act does not cease to be a violation of a law and of a decree merely because it may have been done innocently.
 Accord, e. g., Screw Mach. Tool Co. v. Slater Tool & Engineering Corp., 480 F.2d 1042, 1044 (6th Cir. 1973); Hodgson v. A-1 Ambulance Serv., Inc., 455 F.2d 372, 374 (8th Cir. 1972); NLRB v. Fairview Hospital, 443 F.2d 1217, 1220 (7th Cir. 1971); Doe v. General Hospital, 140 U.S.App.D.C. 149, 434 F.2d 427, 431 (1970); NLRB v. Ralph Printing & Lithographing Co., 433 F.2d 1058, 1062 (8th Cir. 1970), cert. denied, 401 U.S. 925, 91 S.Ct. 883, 27 L.Ed.2d 829 (1971).
 
 
 [6]
 There is no dispute that no bargaining about the change took place. Nor can there be any question that insurance benefits and premiums are a mandatory subject of bargaining. See Allied Chemical & Alkali Workers, Local 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 159, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971), and cases cited note 1. Nor is this a case like Connecticut Light & Power Co. v. NLRB, 476 F.2d 1079 (2d Cir. 1973), involving a refusal to bargain merely about the identity of the carrier, for here the shift in carriers increased employee premiums by $4.20 a month for employees with dependents, see Petitioner's Exh. 53
 
 
 [7]
 The only other evidence we have found that at all supports the Master's finding is (1) Angle's testimony that office records would indicate that the term "Operations Manager" was first used on August 8, 1971, see Tr. at 105; (2) that in a letter of June 16, 1971 from Angle to his attorney, the term "Chief Operator" and the description "Manager in charge of plant operations" was used to describe four individuals who had been Senior Operators and later became Operations Managers, although Angle conceded in a letter that these titles were not in common use at the plant, see Respondent's Exh. H; Tr. at 112, and (3) Angle's assertion that a letter or notice sent in April of 1971 made clear to the then Senior Operators that they had supervisory authority, Tr. at 200. Yet none of this evidence meets the standard set out in our earlier decision in this case
 It is instructive, moreover, to note particularly as a qualification to item (3) above that Angle conceded his doubt that there was any document informing the Senior Operators that they had become supervisors, Tr. at 200-01; that one employee testified that a notice of January 25, 1972, was the first indication to KRH personnel of the new supervisory positions, Petitioner's Exh. 5; Tr. at 581-83; and that another employee testified that Angle's attorney had stated at a bargaining session in February, 1972 that the post of Operations Manager had been created recently, about a month ago, Tr. at 1251.
 
 
 [8]
 The Board's order in 176 N.L.R.B. 1032 (1969) directed Angle, his agents, successors and assigns, to cease and desist from
 (a) Coercively interrogating his employees concerning their adherence to, or activities on behalf of Oil, Chemical Atomic Workers International Union AFL-CIO (hereinafter "the Union"), or any other labor organization, or concerning such adherence or activities of any other employee; threatening to discharge employees for union adherence or activities; threatening to close his helium plant because of employees' union activities; discharging employees for concertedly requesting that plant working conditions be reduced to writing; or granting wage increases to discourage employees from adherence to, or activities on behalf of, any labor organization . . . .
 (b) Discriminating in regard to tenure of employment or any term or condition of employment against any employee to discourage membership in, adherence to, or activities on behalf of, the aforesaid labor organization or any other labor organization.
 The Board's order in 176 N.L.R.B. 1037 (1969) required Angle and his agents to cease and desist from
 (c) In any other manner, interfering with restraining, or coercing (his) employees in the exercise of their rights of self organization, to form, join or assist (the Union), or any other labor organization, and to engage in other concerted activities for the purpose of collective bargaining or mutual aid or protection as guaranteed in Section 7 of the Act, or to refrain from any or all such activities.
 
 
 [9]
 The correctness of this conclusion is easily seen when the instant case is compared to Amalgamated Clothing Workers v. NLRB, 125 U.S.App.D.C. 275, 371 F.2d 740 (1966), where the court upheld an NLRB finding that an employer was liable for unfair labor practices committed by individuals who had no official connection with the employer in question. In that case, the business leaders of a small Southern town had induced the company's relocation in the town, subsidized labor surveys and advanced funds for construction of facilities on which the company had a right of refusal. The businessmen took an active interest in the success of the company and maintained a variety of informal contacts with both labor and management. The Board found the employer and the business leaders to have a community of interest, and took the company's silence about the leaders' anti-union activities as ratification thereof. Id. at 743-44. If the businessmen in that case may be taken as "organs of communication from management," id. at 744, there can be no doubt that Pesicka's actions were attributable to Angle
 
 
 [10]
 The Master made no findings respecting the motivation for or effect of (1) the regular submission of reports to Angle concerning employee Rodgers' conduct, including his union activities, (2) Angle's instruction that Pesicka report to him whatever he could find out about the union, both of which practices appear to be established by uncontroverted evidence, or (3) the persistent surveillance of Rodgers' movement around the plant by other KRH personnel. The difficulty of making those determinations ourselves and the non-dependence of either the disposition or remedy in this case upon the determination of these questions makes it unnecessary for us to remand the case for further fact-finding. Our failure to reach these questions should not be construed as indicating that continuation of these practices would be found to be consistent with the purgation requirements we establish infra. In particular, we find it difficult to imagine a justification for reporting on the union activities of a single employee or following him continuously around the plant, even into the bathroom, see Tr. at 1374, circumstances whose legality is especially doubtful when the subject of the reports is a union ringleader who has more than once been illegally discharged
 
 
 [11]
 Other statements made by Pesicka in the course of this conversation deserve note as well: that if the employees would do their job and not complain so much, they would probably even get a raise as soon as Rodgers gets out of there, and that Rodgers is the whole trouble. Tr. at 592. In a later conversation, Pesicka told Elsen and Brack that "Rodgers isn't going to get any back pay." Id. at 594. The Master made no findings dealing with the uncontroverted evidence that these statements were made
 
 
 [12]
 That being so, we need not consider whether or in what circumstances such a denial by a management official might cure the coercive effect of a statement by a subordinate official, for it makes no difference to either the disposition of the case or the remedy ordered whether we find the statement by Pesicka to Elsen alone to have violated this court's judgment. Nor do we have to rule on the dubious suggestion that the first statement was not coercive if couched in terms of Pesicka's opinion of what Angle might do
 
 
 [13]
 Petitioner at pp. 38-39 of its brief also excepts to the Master's failure to make findings regarding three conversations in which Angle is alleged to have made coercive statements. For reasons stated in notes 10, 12 supra, we need not struggle with the difficulty of making de novo findings ourselves as to these matters. Once again, however, we find it appropriate to comment that our failure to make such findings does not in any way indicate a view that the conduct involved was legal
 
 
 [14]
 The NLRB's orders in both 176 N.L.R.B. 1032 (1969) and 176 N.L.R.B. 1037 (1969) required Angle to offer to Arel Rodgers immediate and full reinstatement to his former or substantially equivalent position without prejudice to his seniority or other rights and privileges previously enjoyed
 
 
 [15]
 Golden State involved a job reorganization by an employer that shifted the status of driver positions from "employee" to "independent contractor," the latter being unprotected, see 29 U.S.C. § 152(3) (1970)
 
 
 [16]
 The rule of Bell Aircraft does not unduly restrict the ability of an employer to manage a plant through his supervisors. For under the compromise struck by the Taft-Hartley amendments, in exchange for a promotion to a supervisory position, an employee may be required to break off his union activity and forfeit protection under section 7. Were Rodgers to be offered reinstatement as a supervisor, he could be put to that choice. And if after accepting a supervisory position and having had a reasonable time in which to comply with an employer's demand that he dissociate himself from union activity, a former employee reinstated to supervisory status continued to participate in union activity, that participation could ordinarily constitute the basis for discharge, although plainly a supervisor could not properly be discharged because of his union activity while an employee
 
 
 [17]
 Our conclusion that Luft's fears must be thought reasonable is reinforced by the uncontroverted evidence that Wagner was an anti-union employee and a friend of Pesicka's, so that Luft might well expect that he would be assigned all blame and disciplined for the incident
 
 
 [18]
 We need not discuss the Master's finding emphasized by respondent, that Rodgers, without any request from Luft, persuaded him to insist upon representation, for we do not believe the question of what motivated Luft to assert his Section 7 rights is material to the issue presented
 We note that respondent's brief cites to NLRB v. Quality Mfg. Co., 481 F.2d 1018 (4th Cir. 1973), to support the proposition that there is no right to the presence of a representative when there is no reasonable fear of discipline. This argument becomes immaterial in light of our inability to adopt the Master's finding that there could be no such reasonable fear. We refer to this, however, to reiterate our dissatisfaction, see note 4 supra, with the kind of brief writing that results in citation of a circuit decision with no indication whatsoever that it has been reversed by the Supreme Court, see 420 U.S. 276, 95 S.Ct. 959 (1975).
 
 
 [19]
 That Rodger's discharge, as well as Luft's violated our order and the Act is clear from ILGWU v. Quality Mfg. Co., 420 U.S. 276, 280, 95 S.Ct. 972, 43 L.Ed.2d 189 (1975) (companion case to Weingarten )
 Luft and Rodgers were temporarily reinstated pursuant to an order of this court, pending completion of contempt proceedings, see note 2 supra, and returned to work in September of 1972. In May of 1973, both men wrote Angle, announcing that they were terminating their employment, and stating: "I cannot continue to work under these conditions until you comply with the court's orders." The Board alleged that the men were constructively discharged, but the Master disagreed. Master's Report at 17.
 The Board's exceptions to the Master's report challenge this finding. The exceptions themselves however, are nothing more than a sentence-by-sentence objection to virtually every aspect of the Master's report. In the Board's brief, the only references to this matter are (1) its inclusion in the statement of issues, and (2) a statement in passing that the Board had alleged that the men were constructively discharged, but that the Master found otherwise. Nowhere does the Board provide arguments or direct us to record evidence that might establish the commission of reversible error by the Master. We believe that in excepting to a master's findings, a party cannot rely upon such a scattershot approach. We cannot be expected to undertake a complete review of the voluminous record evidence and then proceed, in effect, to act, at least in the first instance, as that party's advocate to determine whether the unadorned exception has any merit. We therefore decline to overturn the Master's finding on this issue.
 Nevertheless, in fashioning appropriate relief for Rodgers and Luft, we need not reach the significance of their voluntary departures from the positions to which they had been temporarily reinstated. Compare Oil, Chemical & Atomic Workers v. NLRB, No. 75-1065 (D.C. Cir., June 28, 1976). The Master's findings indicate that following this court's temporary reinstatement order Rodgers and Luft engaged in attempts to manufacture evidence on which to base contempt charges against Angle. Specifically, the Master found that the circumstances surrounding Rodgers' and Luft's acceptances of temporary positions, as well as their departures, reflected a concerted effort to fabricate evidence of noncompliance with this court's order. See Master's Report at 16-17. The Master further concluded that Rodgers, "by his purposeful failure to obey reasonable instructions, and by a deliberate course of conduct calculated to make Angle's efforts to require him to perform duties properly expected of him as an employee appear to constitute noncompliance with the Court orders, did interfere with and impede Angle's efforts to comply with the Court's orders." Id. at 23. Keeping in mind that the Master had the opportunity to observe Rodgers' and Luft's demeanor in testifying, we cannot say that his findings regarding their intentions were clearly erroneous. As a consequence, we believe that Rodgers and Luft are not entitled to the remedy of a reinstatement order. Notwithstanding Angle's contumacious conduct, he should not be forced to live with hostile employees who have conspired to cause unnecessary trouble. See, e.g., NLRB v. Nat'l Manufacturing Co., 315 F.2d 280, 286 (7th Cir. 1963); NLRB v. Apico Inns, 512 F.2d 1171, 1175 (9th Cir. 1975). Nor can we condone action designed to subvert the integrity of enforcement proceedings. See, e.g., NLRB v. Magnusen, 523 F.2d 643 (9th Cir. 1975). Even so, Rodgers and Luft should not be deprived of backpay which accrued prior to their misconduct. Since it is difficult to define the precise point at which their acts in cumulative effect precluded reinstatement, and in order to avoid further delay in this protracted litigation, we think the Board should award backpay covering the period from their illegal discharges until their voluntary departures from the plant.