**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**RETAIL STORE EMPLOYEES UNION, LOCAL 876, Retail Clerks International Association, AFL–CIO, Respondent.**

**No. 76–1004.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 12, 1977.

Decided Jan. 11, 1978.

Elliott Moore, Deputy Associate Gen. Counsel, William R. Stewart, N. L. R. B., Washington, D. C., for petitioner.

Theodore Sachs, Rolland O'Hare, Marston, Sachs, Nunn, Kates, Kadushin & O'Hare, P. C., Detroit, Mich., for respondent.

Before CELEBREZZE, ENGEL, Circuit Judges, and WALINSKI,* District Judge.

---

* The Honorable Nicholas J. Walinski, Judge, United States District Court for the Northern District of Ohio, sitting by designation.

1. The Board also found that Pennacchini's discharge violated § 8(a)(1) of the Act, which makes it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in Section 7 of this Act." Because of our disposition of the

CELEBREZZE, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order that Retail Store Employees Union Local 876 reinstate a former employee, Anna Pennacchini, with back pay. The Board found in an unfair labor practice proceeding that the union *qua* employer had violated § 8(a)(4) of the National Labor Relations Act ("the Act") by firing Pennacchini in retaliation for her refusal to testify voluntarily for the union in an earlier unfair labor practice proceeding.[1] 219 NLRB 1188 (1975). Section 8(a)(4) states that it shall be an unfair labor practice for an employer "to discharge or otherwise discriminate against an employee because he has filed charges or given testimony" in an NLRB proceeding. The union petitions for reversal of the Board order on the grounds, *inter alia*, that the Board's findings are not supported by substantial evidence, that § 8(a)(4) does not protect employees who have refused to offer testimony, that Pennacchini was a "managerial" employee not protected by the Act, and that the reinstatement order constituted an abuse of discretion.

The principal factual dispute before the Board was whether Anna Pennacchini's discharge had been motivated, at least in part, by her refusal to testify for her employer in an unfair labor practice proceeding involving a former fellow employee, Barbara Frazier. Frazier was discharged by the union in October 1972, and immediately initiated proceedings against the union, alleging that her discharge was violative of the Act. According to Pennacchini,[2] union president Horace Brown told her on several occasions in early 1973 that she was expected to testify at Frazier's hearing, and he also directed Pennacchini to prepare a list of alleged improprieties committed by Frazier,

§ 8(a)(4) charge, we need not review the Board's finding with respect to § 8(a)(1). *See* NLRB v. Scrivener, 405 U.S. 117, 125, 92 S.Ct. 798, 31 L.Ed.2d 79 (1972).

2. Pennacchini testified at her own unfair labor practice hearing, conducted before an Administrative Law Judge. 219 NLRB at 1190–91.

based on rumors that he (Brown) had heard. Pennacchini further maintains that on the day before the Frazier hearing, she was asked by the union's attorney if she was prepared to testify at the hearing to substantiate the allegations in the list she had prepared for Brown. Her response was that she had "never personally observed any" of the misconduct alleged in the list, and that she knew that the attorney "would not want [her] to testify to something [she] did not personally observe."

Pennacchini was not called as a witness by either side at the Frazier hearing, although the union could have subpoenaed her testimony under § 11(1) of the Act. Approximately one month later, Brown fired Pennacchini in a termination letter that accused her of "extraordinary disloyalty" and of "conveniently" forgetting certain facts that tended to incriminate Frazier.[3]

Shortly after receiving the termination letter, Pennacchini filed an unfair labor practice charge against the union. The Administrative Law Judge concluded that Pennacchini "was an essentially truthful witness." 219 NLRB at 1194. He also concluded that the union had terminated Pennacchini "because she refused to appear voluntarily as a witness in the unfair labor practice proceeding involving a former fellow employee, on the ground that she had no direct knowledge of the matters about which she was to be questioned." *Id.* The Board adopted the findings and conclusions of the Administrative Law Judge, noting that it was "abundantly clear that Pennacchini's discharge was motivated, at least in part, by her refusal to cooperate with the Respondent,  .  .  .  when, in the presence of Brown and the Respondent's counsel, she disclaimed firsthand knowledge of Frazier's shortcomings." 219 NLRB at 1188.

■ We have carefully reviewed the record, and conclude that the Board's findings of fact are supported by substantial evidence on the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). According to Pennacchini's credited testimony, she was asked by the union if she would testify in support of certain allegations against Frazi-

---

**3.** Dear Mrs. Pennacchini:

This is to notify you of your termination of employment with Local 876, effective immediately.

I am terminating your department and position, effective immediately, to complete the phase-out which began many months ago. Quite frankly, I would have taken this action sooner but I was determined to avoid any incident which might be claimed to prejudice the Union elections, just concluded, whose fairness I was determined to assure.

You should also know that even had I not terminated your department and position, as I am doing, I would have found your discharge necessary because of your extraordinary disloyalty and breaches of confidence as an employee.

These include, according to the testimony of Barbara Frazier in her NLRB trial, your reporting to her the conversation between our attorney and yourself, including part of the intended Union defense against Mrs. Frazier's unjustified claim. Not only did you conveniently "forget" those facts which you had previously told me about Mrs. Frazier, which had in part influenced my decision to terminate her, but by communicating to a person suing the Union the confidences of your employer and its attorney in connection with the defense of that matter, you violated every obligation of trust due to your employer. Secondly, you were plainly responsible for the unauthorized and surreptitious release of the Union's mailing list in connection with a campaign mailing by Ray Soncrant. Quite apart from the malicious content of that document, you violated your obligation to maintain the confidence of that list, which was entrusted to you only for authorized purposes.

As the chief executive officer of this Union, I would find intolerable disloyalty to the Union and breaches of its confidences by any employee. But for such misconduct to occur by an employee in your sensitive and confidential relationship is inexcusable. The Union obviously cannot be in the position of having its policies and confidences violated by someone whose very job responsibility it is faithfully to execute and protect them.

Although, as chief executive officer, I am constitutionally empowered to discharge you without cause, I point out all of these matters so there will be no false accusations as to the reason for your discharge.

Sincerely,
/s/ Horace Brown
Horace Brown
President

er and she refused. The termination letter demonstrates that Pennacchini's conduct with regard to the Frazier hearing was clearly on Brown's mind when he fired her. Based on this evidence, the Board could reasonably conclude that the firing was at least partially motivated by Pennacchini's refusal to testify.

■ We recognize that Pennacchini's discharge may have been motivated by factors other than her refusal to testify: indeed, the termination letter suggests several possible explanations.[4] But it is not the job of this Court to conduct a de novo consideration of the evidence: we need only find that there was substantial evidence to support the Board's conclusion. Moreover, the Board was not obligated to find that Pennacchini's refusal to testify was the sole motivating factor in her discharge. *See NLRB v. West Side Carpet Cleaning Co.,* 329 F.2d 758, 761 (6th Cir. 1964).

■ As we read the Board's findings, Pennacchini was fired because she would not testify in support of the union's position at the Frazier unfair labor practice proceeding. The principal legal issue in this case is whether such a discharge constitutes a violation of § 8(a)(4) of the Act. We believe that it does.

Although the specific language of § 8(a)(4) refers only to an employee who "has filed charges or given testimony," the Supreme Court has read the statute to protect other employees as well. In *NLRB v. Scrivener,* 405 U.S. 117, 92 S.Ct. 798, 31 L.Ed.2d 79 (1972), the Court held that § 8(a)(4) precludes the discharge of an employee for giving written sworn statements to a Board field examiner. The employee had not "filed charges or given testimony," but the Court felt that Congress had intended to protect employee participation in the investigatory, as well as the hearing stages of Board proceedings.

The Act's reference in § 8(a)(4) to an employee who "has filed charges or given testimony," could be read strictly and confined in its reach to formal charges and formal testimony. It can also be read more broadly. On textual analysis alone, the presence of the preceding words "to discharge or otherwise discriminate" reveals, we think, particularly by the word "otherwise," an intent on the part of Congress *to afford broad rather than narrow protection to the employee. Id.* at 122, 92 S.Ct. at 801 (emphasis supplied).

This interpretation was consistent with the purpose of the section, which was to ensure that all persons with information about unfair labor practices "'be completely free from coercion against reporting them to the Board.'" *Id.* at 121, 92 S.Ct. at 801, quoting *Nash v. Florida Industrial Comm'n,* 389 U.S. 235, 238, 88 S.Ct. 362, 19 L.Ed.2d 438 (1967). Such "complete freedom" is necessary, said the Court, "'to prevent the Board's channels of information from being dried up by employer intimidation of prospective complainants and witnesses.'" 405 U.S. at 122, 92 S.Ct. at 801, quoting *John Hancock Mut. Life Ins. Co. v. NLRB,* 89 U.S.App.D.C. 261, 263, 191 F.2d 483, 485 (1951).

Similar considerations militate in favor of extending statutory protection to the activity involved in this case. Although Pennacchini was not prevented from reporting information to the Board, the coercion applied against her had a direct bearing on a pending Board proceeding. Had she acquiesced in her employer's request that she testify against Frazier, she could very well have perjured herself before the Board. The result would have been more serious than a closing of "channels of information" to the Board. It would have been the outright misleading of the Board. Coercing employees to give untrue testimony just as surely undermines the integrity of Board proceedings as does coercing employees to give no testimony at all.

---

**4.** The union maintains that Pennacchini was discharged because her position had been eliminated. In view of the failure of the union to fire Pennacchini until several months after her job had ostensibly been eliminated, the Board could well have been skeptical of this explanation.

The fact that Pennacchini never actually gave testimony or spoke with a Board agent is irrelevant. As the Court pointed out in *Scrivener*, the practicalities of administrative action require that § 8(a)(4) protection not be limited to particular, discrete stages of Board proceedings.

> An employee who participates in a Board investigation may not be called formally to testify or may be discharged before any hearing at which he could testify. His contribution might be merely cumulative or the case may be settled or dismissed before hearing. *Which employees receive statutory protection should not turn on the vagaries of the selection process or on other events that have no relation to the need for protection.* It would make less than complete sense to protect the employee because he participates in the formal inception of the process (by filing a charge) or in the final, formal presentation, but not to protect his participation in the important developmental stages that fall between these two points in time. This would be unequal and inconsistent protection *and is not the protection needed to preserve the integrity of the Board process in its entirety.*
> 405 U.S. at 123–24, 92 S.Ct. at 802 (emphasis supplied).

We think that the "integrity of the Board process in its entirety" would be seriously undercut if employers were allowed to freely discharge employees who because of lack of knowledge refuse to testify in support of the employer position at an unfair labor practice hearing.[5] Employees might well feel compelled to offer misleading statements to the Board if they knew they could be fired for showing reticence in coming forward with testimony favorable to the management side. Fair adjudication of disputes requires that witnesses be free from excessive external pressures to manufacture or withhold particular evidence.

The legislative history of § 8(a)(4) supports application of the statute in this case. In the Senate debates on the Wagner Act, of which § 8(a)(4) was a part, Senator Wagner gave the following example of the kind of coercion that § 8(a)(4) was designed to alleviate:

> In certain plants which now have company-dominated unions, the employees were asked to sign petitions, to be sent to their representatives, opposing this bill. I received personal letters from workers in which they said they had signed these petitions because they knew if they did not do so their jobs would be lost, and that they needed their jobs in order that their families might eat. *It is that sort of discrimination which we wish to prevent.*
> 79 Cong.Rec. 7676 (1935) (emphasis supplied).

Coercing employees to sign petitions with which they do not agree is closely analogous to coercing employees to give testimony they believe to be false. The intent of the Act's authors was that workers should not feel compelled by the threat of employer retaliation to misrepresent their own knowledge or beliefs on matters relevant to the Act.

Respondent argues that protecting a refusal to testify will actually dry up channels of information to the Board by encouraging the withholding of evidence. What we are protecting here, however, is not simply a refusal to testify: if that were the only issue, then the union would have subpoenaed Pennacchini, as the Act clearly permits it to do. *See* 29 U.S.C. § 161(1). Rather, we are protecting employees from pressure to deliver false or misleading information to the Board. Section 8(a)(4) by itself neither encourages nor discourages testimony: it simply leaves employees free to

---

**5.** In *Hoover Design Corp. v. NLRB*, 402 F.2d 987 (6th Cir. 1968), this Court ruled that the discharge of an employee for threatening to go to the Board or threatening to file charges with the Board did not constitute a violation of § 8(a)(4). Although we are not presented with a case involving "threats" to file charges, we note that *Hoover Design* was decided prior to the Supreme Court's decision in *Scrivener*. To the extent that *Hoover Design* is inconsistent with *Scrivener*, it is obviously no longer binding authority.

choose their actions before the Board without fear of employer reprisals.[6]

Respondent has maintained throughout the proceedings that Pennacchini was a "managerial" employee, not subject to the protections of the Act. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 289, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). Pennacchini's job involved preparation of the union newspaper. The union contends that, in that capacity, she exercised such independence of judgment as to identify her with management. The Board expressly adopted the finding of the Administrative Law Judge that Pennacchini was not a managerial employee. 219 NLRB at 1188 n. 3.

Our standard of review on this issue is whether the Board's decision has "warrant in the record" and a "reasonable basis in law." *NLRB v. Hearst Publications*, 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). *See also* K. C. Davis, Administrative Law of the Seventies § 30.-00 at 691 (1976). We find that standard to be fully met in this case. "Managerial" employees are those "who formulate, determine, and effectuate an employer's policies." *Eastern Camera & Photo Corp.*, 140 NLRB 569, 571 (1963), *cited with approval* in *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 290 n. 19, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). The determination of an employee's managerial status "depends upon the extent of his discretion, although even the authority to exercise considerable discretion does not render an employee managerial where his decision must conform to the employer's established policy." 140 NLRB

at 571. According to Pennacchini's credited testimony, she had nothing to do with the policies concerning what should be printed in the union newspaper and never decided what should be included in an article. She would always submit items suggested for publication to the union's chief executive officer for approval, and rarely (if ever) expressed an opinion to him on the substance of the articles she was directed to publish. Her other duties were to proofread collective bargaining agreements, prepare flyers and handbills, construct photographic layouts, and occasionally run the duplicating machine. She did not attend any strategy meetings of union officials.

This evidence provided a sufficient basis upon which the Board could reasonably conclude that Pennacchini did not "formulate, determine, and effectuate" her employer's policies. There is "warrant in the record" to support the premise that her job-related decisions had to "conform to the employer's established policy," and were not the result of her independent judgment. In this regard, this case is distinguishable from *Wichita Eagle & Publishing Co., Inc. v. NLRB*, 480 F.2d 52 (10th Cir. 1973), *cert. den.* 416 U.S. 982, 94 S.Ct. 2383, 40 L.Ed.2d 758 (1974) where the Court found an editorial writer of a daily newspaper to be a "managerial" employee. The writer in *Wichita Eagle* "could, and did, propose topics for editorials, [and] propound her own viewpoint in an effort to influence editorial policy on various subjects." *Id.* at 55. Here, there was ample testimony—which the Board found credible[7]—that Pennacchi-

---

**6.** This is not to suggest that § 8(a)(4) protects improper employee conduct, such as perjury, before the Board. Since there are no allegations of misconduct by Pennacchini in Board proceedings, we are not presented with that question in this case.

**7.** The Board adopted the following conclusion of the Administrative Law Judge:

Although [Pennacchini] performed duties that placed her somewhat above the level of other clerical and office employees, the evidence, on balance, convinces me that she was not in the managerial category. As we have seen, she frequently consulted with the executive head of the Union and, while she

exercised considerable independence of judgment respecting the specific content of the editorials she wrote on behalf of the head of the Union, they were subject to discussion with her superiors before being composed and published. 219 NLRB at 1193–94.

Respondent suggests that a finding that Pennacchini exercised "considerable independence of judgment respecting the specific content of the editorials she wrote" compels a finding that she was managerial employee. As we interpret the Administrative Law Judge's decision, and the testimony he credited, Pennacchini's independence of judgment went only to the form, and not the substance of the editorials.

ni neither contributed her own views or proposed editorial topics. Rather, she simply did what she was told.[8]

Respondent also argues that reinstatement is an inappropriate remedy because "there is no position to which Pennacchini can be reinstated."[9] This claim is without merit. Neither the Board nor the Administrative Law Judge made a specific finding that Pennacchini's position had been eliminated. Even if there were such a finding, this Court cannot disturb the reinstatement order "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Electric and Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). We see no attempt to evade the purposes of the Act here. Indeed, reinstatement of Pennacchini will effectuate the Act's goal of protecting employees from unfair labor practices by making them whole after wrongful discharge, and by deterring future violations of the Act. *See Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 181–82, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973). To allow an employer to evade a reinstatement order by styling the wrongful discharge of an employee as an "elimination" of her position would deny that employee a meaningful remedy and actually thwart the goals of national labor policy.

The situation here is distinguishable from that in *NLRB v. Schnell Tool & Die Corp.*, 359 F.2d 39 (6th Cir. 1966), where this Court refused to enforce a Board reinstatement order against employers who had sold their businesses subsequent to violating the Act. Issuance of an enforcement decree there would have been a "vain act" because any reinstatement order would have been ineffective against the successor employers, whose liability under the Act had not yet been determined by the Board. Here, the employer against whom enforcement is sought is the same employer found in violation of the Act.

Likewise distinguishable is *Trico Products Corp. v. NLRB*, 489 F.2d 347 (2d Cir. 1974), where the Second Circuit refused to order reinstatement of employees who would have been laid off in any event for economic reasons. Respondent here admits that the Union still publishes a newspaper, albeit through an independent contractor. The fact that an employer may have hired an independent contractor to do the work of a wrongfully discharged employee does not preclude the reinstatement remedy. *Fibreboard Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). *See also NLRB v. Jackson Farmers, Inc.*, 457 F.2d 516, 518 (10th Cir. 1972).

Respondent further urges that reinstatement would be improper because of a "basic antagonism" between Pennacchini and the union president (Brown).[10] In an election shortly before Pennacchini's discharge, she openly and vigorously supported Brown's opponent for the union presidency. The union seems to feel that this conduct precludes the possibility of future harmonious relations between Pennacchini and Brown, and that requiring them to work together on production of the union newspaper would create an intolerable situation.

---

**8.** In endorsing the findings of the Administrative Law Judge with regard to Pennacchini's non-managerial status, *see* note 7, supra, the Board also noted that "Pennacchini's alleged 'managerial' status had drastically changed in the months preceding her discharge." 219 NLRB at 1188 n. 3. This "further weaken[ed] the argument that she enjoyed such special status." *Id.*

**9.** The actual order was that Pennacchini be offered "immediate reinstatement to her former job, or if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority and other rights and privileges."

219 NLRB at 1194. Determination of whether "a substantially equivalent" position is available is ordinarily left to the compliance stage of Board proceedings. *See North Valley Lumber Sales, Inc., and Ralph Allen*, 229 NLRB No. 178 (1977).

**10.** Respondent attempted to show before the Administrative Law Judge that Pennacchini was guilty of misconduct that might preclude a reinstatement order. The judge considered the chief claim of misconduct and found the evidence to be "inconclusive." 210 NLRB at 1193 n. 8.

Circuit Courts have on occasion refused to enforce reinstatement orders where the employee involved had shown extreme disloyalty or antagonism toward the employer. In *NLRB v. Bin-Dicator Co.*, 356 F.2d 210 (6th Cir. 1966), this Court denied reinstatement where the employee had threatened to cause the plant manager to "spend some time in a wheel chair," made threatening gestures at supervisors, and threatened to strike a foreman with a heavy metal casing.[11] Likewise, in *NLRB v. National Furniture Mfg. Co.*, 315 F.2d 280, 286–87 n. 7 (7th Cir. 1963), the Court refused to order reinstatement where the employee had shown a "disrespectful attitude" toward the employer's general manager, had made damaging statements to at least one customer, and had made derogatory remarks about the personnel manager. And in *NLRB v. Valley Die Cast Corp.*, 303 F.2d 64, 66 (6th Cir. 1962), we denied reinstatement to an employee who with threats prevented maintenance men from entering a company building.[12]

These cases involved acts of employee antagonism far more flagrant than that alleged here. Pennacchini did not threaten union officials and in no way disrupted her employer's work. Of course, Pennacchini's prior opposition to Brown's re-election is likely to cause some friction if she resumes her former position. We are, however, bound to give "special respect" to the Board's choice of remedy, based on its judgment as to how effectively to promote the goals of the Act. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). As noted by the First Circuit in a similar case, the Board "may have believed that a less complete remedy would leave doubt as to whether the Act fully protected the rights of employees." *Trustees of Boston Univ. v. NLRB*, 548 F.2d 391, 393–94 (1st Cir. 1977). Under these facts, we cannot say that the reinstatement order constituted an abuse of discretion.[13]

We have considered all of Respondent's other arguments and find them to be without merit.

We find that there is substantial evidence to support the Board's findings, accordingly enforcement is GRANTED.

---

11. In *Bin-Dicator*, the Court gave "special examination" to the reinstatement order because the Board order conflicted with that of its trial examiner. 356 F.2d at 215. Here, the Board and its Administrative Law Judge are in complete agreement.

12. *See also NLRB v. Apico Inns of Calif., Inc.*, 512 F.2d 1171, 1175–76 (9th Cir. 1975), and *Oil, Chemical & Atomic Workers Union v. NLRB*, 178 U.S.App.D.C. 278, 295–296, 547 F.2d 575, 592–93 n. 19 (1976), *cert. den., Angle v. NLRB*, 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977) (both denying reinstatement).

13. *See NLRB v. Miller Redwood Co.*, 407 F.2d 1366, 1370 n. 2 (9th Cir. 1969), and *NLRB v. Yazoo Elect. Power Assoc.*, 405 F.2d 479, 480 (5th Cir. 1968) (both enforcing reinstatement orders).