UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 94-2048

NATIONAL SURFACE CLEANING, INC.,

Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent.

ON PETITION FOR REVIEW AND CROSS-APPLICATION
FOR ENFORCEMENT OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD

Before

Cyr, Circuit Judge,

Aldrich, Senior Circuit Judge,

and Boudin, Circuit Judge.

Nathan L. Kaitz with whom Morgan, Brown & Joy was on brief for
petitioner.
Richard Cohen with whom Frederick Havard, Supervisory Attorney,
Frederick L. Feinstein, General Counsel, Linda Sher, Acting Associate
General Counsel, Aileen A. Armstrong, Deputy Associate General
Counsel, and National Labor Relations Board were on brief for
respondent.

May 15, 1995


-2-

ALDRICH, Senior Circuit Judge. This is a petition

by National Surface Cleaning, Inc. to review and set aside an

order of the National Labor Relations Board finding that it

unlawfully discharged employees Humberto Yeppes, Carlos

Silva, Libardo Quintero, and Jairo and Cesar Duque, in

violation of Section 8(a)(4) and (1) of the National Labor

Relations Act, 29 U.S.C. 158(a)(4) and (1). In re National

Surface Cleaning, 314 NLRB No. 92 (July 28, 1994). The Board

found National violated the Act by notifying Yeppes on March

13, 1993 that he would never work for the company again

because of having filed an unfair labor practice charge

against it on March 2, 1993, and by discharging the four

others for assisting or supporting him. National's position

is that (1) substantial evidence does not support the Board's

finding as to Yeppes because he was let go prior to its

learning of the charge, (2) the Board misconstrued section

8(a)(4) in ruling that it protects the others, and (3)

ignored evidence indicating National's actions were in no way

based upon the charge.

Background

National is engaged in asbestos removal at various

sites in and around New York. At each site it employs a

project manager, foremen, and a crew of asbestos removal

workers, members of the Mason Tenders Union. Typically,

these workers are hired on a project by project basis. They

-3-

may be laid off for some time, and recalled when required.

As of February 1992 the employees in the present

case were all working at 1411 Broadway under project manager

Pablo Ortega. On February 21, Ortega laid off the entire

crew,1 with the exception of five employees who he brought

to a new project at the Grace building. Some of those laid

off believed they were not transferred because National

intended to complete the Grace job with non-union workers.

On March 2, 1992, Yeppes visited the Grace building

and thanked Ortega for having employed him at 1411 Broadway,

but Ortega did not offer him work at the new site. Later

that day, Yeppes filed an unfair labor practice charge with

the Board, alleging National laid off its employees at 1411

Broadway and did not recall them to the Grace site because of

their union membership. Around March 5 Yeppes and some of

the others also complained to the union local. On March 6 or

7, Ortega called Quintero and asked him to contact the group

who had been laid off from 1411 Broadway and tell them to

report to work at the Grace building on Monday, March 9.

Quintero complied, but did not call Yeppes because he

regarded Yeppes as a supervisor2 and therefore not included

in the group. On March 9, all except Yeppes began working at



1. There was some dispute as to whether Yeppes was laid off
at this time or sometime prior to the others.

2. Yeppes had at times been employed as a project manager.

-4-

the Grace site.

-5-

National received Yeppes' Board complaint on March

9, and Ortega testified to hearing about it by March 10 or

11. However, a union representative had visited the Grace

site to check union cards sometime before March 9.3

On March 12, foreman Javiar Alzate told Quintero,

Silva and the Duque brothers upon their arrival at work that

they should not begin and to wait for Ortega. According to

the employees, when Ortega arrived he accused them of filing

a complaint against him, which they denied. He claimed to

have seen Yeppes' name on a complaint but admitted he had not

seen the others' names. He then told them they were no

longer needed at the Grace building but might be able to find

work at 100 Wall Street or 1411 Broadway. He also asked

Jairo Duque to talk to Yeppes. Ortega testified that he laid

them off because they had been late to work on March 12 (and

Jairo Duque had missed several days that week) and because

they never showed up at 1411 Broadway,4 but it is undisputed

that the only subject he discussed with them on the morning

of the 12th was the complaint. Later that day foreman Alzate



3. The testimony of Jairo Duque suggests that Ortega was
prompted to recall the laid off workers after the union shop
steward visited the building.

4. Ortega testified that he called the Duque brothers on
Friday evening, March 12, and left a message for them to
report to 1411 Broadway the next day for a weekend job. They
claim they were never told. They did go to 100 Wall Street
on Monday, March 16, but found no one there and, assuming
Ortega had misled them, never went to the 1411 Broadway site.

-6-

told two other employees that a group could no longer work

for National because they had put in a complaint against the

company. The brother of one of the employees, also a

foreman, told him the same thing.

On March 13 Ortega called Yeppes and said he had

found out about the complaint and was upset that Yeppes had

come to thank him and then turned around and filed a charge

against him. Yeppes testified that Ortega then told him he

would never work for the company again. Ortega denied ever

saying this. Yeppes in fact has never worked for National

again, and the other four, despite efforts, have also been

unable to get themselves rehired.5

Yeppes

Section 8(a)(4) of the Act makes it unlawful "to

discharge or otherwise discriminate against an employee

because he has filed charges or given testimony under this

Act." N.L.R.A. 8(a)(4), 29 U.S.C. 158(a)(4). The Board

found Ortega's decision not to recall Yeppes to the Grace

building along with the others on March 9 did not violate the



5. Quintero once sought work at 1411 Broadway with a co-
worker, the co-worker was hired, but Quintero was told by a
supervisor that he had been instructed not to hire anyone
involved in the complaint against the company. Another time,
he had been under the impression that he had been rehired,
but when he showed up he was informed he was not among those
recalled because he was involved in the complaint. Ortega
eventually rehired Silva for the 1411 Broadway weekend job,
but we decline to disturb the Board's finding that this
"simply represents . . . that Ortega changed his mind about
Silva," and had no effect on the March 12 events.

-7-

Act, but that Ortega's March 13 communication with Yeppes to

the effect that he would never work for National again

because he had filed charges against Ortega and the company,

did. The question here is not whether 8(a)(4) applies, but

whether Yeppes was effectively discharged on March 13 because

of the charge, or for unrelated reasons sometime prior to

National's (or Ortega's) awareness of the charge, as National

contends.

National claims the evidence establishes that

Ortega never intended to recall Yeppes after he was laid off

sometime in February because he felt he could no longer work

with Yeppes6 and never intended to hire him again. It

insists that Yeppes had therefore been discharged well before

it became aware of his unfair labor practice charge.

National points to the fact that on March 2 Yeppes sought out

Ortega and thanked him for having given him work, and to

Ortega's testimony that he was dissatisfied with Yeppes and

that it was his practice simply to never recall such an

employee, rather than to inform him that he is permanently

discharged, and that all of this conclusively supports the

inference that Yeppes had been discharged effective prior to

his ever having filed the charge. It furthermore claims the



6. National claims Yeppes had repeated difficulty with
Ortega, in large part because he had once been employed as a
supervisor and the younger and less experienced Ortega had
worked under him.

-8-

Board had no basis for crediting Yeppes' testimony regarding

Ortega's March 13 threat that Yeppes would never work for the

company again when Ortega denied ever making it.

We are satisfied that the Board reasonably resolved

these credibility issues against National, and its conclusion

that the March 13 conversation transformed Yeppes' temporary

lay off into permanent discharge is supported by substantial

evidence. Universal Camera Corp. v. NLRB, 341 U.S. 474, 71

S.Ct. 456, 95 L.Ed. 456 (1951). The Board found no evidence

Yeppes had been permanently discharged simply by virtue of

the fact that he was not recalled along with the others on

March 9. Further, simply because Ortega had difficulty

working with Yeppes does not mean other National project

managers did or would, so even if Ortega himself never

intended to recall Yeppes this does not mean he had been

discharged by National. Yeppes had completed jobs

satisfactorily for other National supervisors, and had been a

project manager himself prior to working for Ortega. And if

Yeppes had already been permanently discharged, why would

Ortega need to tell him on March 13, while castigating him

for filing charges against him and the company, that he would

never work for the company again, as the Board found.

Finally, there was evidence that other supervisors had been

told not to use any of the employees associated with filing

the charge, providing the Board with reason to conclude

-9-

Ortega's threat was neither fictional nor

-10-

idle, and was prompted by and delivered in retaliation for

Yeppes' having exercised his rights under the Act.

The Four Other Employees

As to the other four employees, the questions are,

first, whether they were discharged; second, if so, whether

this was for being late to work and not showing up at a job

to which they had allegedly been reassigned, as National

contends, or because National believed they had participated

in filing charges under the Act, as the Board found; and

third, whether 8(a)(4) prohibits an employer from

discharging or otherwise discriminating against an employee

for believing that he "supported" or "assisted" another in

relation to filing such charges against it.

Reasons for the Discharge

The Board concluded that the four had been

discharged, "because they had a reasonable basis for

believing . . . that the Company no longer desired their

services," citing Ridgeway Trucking Co., 243 NLRB 1048 (1979)

("the fact of a discharge does not depend on the use of

formal words of firing," but upon whether the employer's

words or actions "would logically lead a prudent person to

believe his tenure had been terminated"). Second, the Board

found their discharge was in retaliation for the unfair labor

practice charge, which National believed they "supported" or

"assisted" Yeppes in filing.

-11-

National counters that the evidence is clear that

Quintero, Silva and the Duque brothers were discharged

because they were late to work on March 12, and did not show

up at 1411 Broadway on March 14, the job to which Ortega

testified he had reassigned them. The Board's considered

assessment of the evidence found it did not support this

version of events.

Again, we find the Board's conclusion is based upon

reasonable resolutions of credibility issues. There was no

evidence lateness was discussed during Ortega's interrogation

of the four employees on the morning of March 12, nor is

there any solid evidence each of them was late on that day.7

There was evidence, however, that during this meeting Ortega

was visibly upset by news of the charge, initially accused

the four men of having filed it, repeatedly questioned them

about it, specifically requested that Jairo Duque contact

Yeppes in a manner that suggested, as the Board found, that

he meant for Jairo to talk Yeppes into dropping the charge,

and simultaneously informed all four that they were off the

job. The four denied ever being told to report for work at

1411 Broadway on Saturday, March 14. Nor is there evidence

that the supervisor on that project expected them. On the

contrary, they testified that Ortega told them to try to find



7. In fact, there was testimony that Silva was already
upstairs suiting up for work when he was told to go back
downstairs and wait for Ortega to arrive.

-12-

work elsewhere, at 100 Wall Street or 1411 Broadway. When

they tried the former, they found no one there and concluded

they had been, in effect, discharged.

The Scope of Section 8(a)(4)

National contends in any event that an employer

cannot be found in violation of 8(a)(4) for taking an

adverse action against an employee unless that employee has,

strictly, "filed charges or given testimony under the Act."

N.L.R.A. 8(a)(4), 29 U.S.C. 158(a)(4), and that the Board

impermissibly broadened its scope by ruling that it also

protects supporting or assisting another in relation to the

filing of charges.

Section 8(a)(4) should be read broadly in favor of

the employee, NLRB v. Scrivener, 405 U.S. 117, 122 (1972),

NLRB v. Globe Manufacturing Co., 580 F.2d 18, 20 (1st Cir.

1978), and the Board's reading, if permissible, is entitled

to substantial deference. NLRB v. J. Weingarten, Inc., 420

U.S. 251, 266-67 (1974).

Scrivener held that 8(a)(4) protected employees

who gave sworn statements to a Board field examiner

investigating an unfair labor practice charge filed against

their employer, although they had neither personally "filed

charges" nor literally "given testimony." 405 U.S. 117, 121.

The Court found this liberal approach justified by the

congressional purpose to allow "all persons with information

-13-

about [unfair labor] practices to be completely free from

coercion against reporting them to the Board," id. at 121

(citation omitted), and to protect the integrity of all

investigative stages of Board proceedings and an employee's

participation in them, regardless of whether it falls

somewhere between an actual filing and formal testifying.

Id. at 122-124.

The Scrivener rationale has led to the

interpretation of 8(a)(4) to protect an employee who merely

threatens to file charges with the Board, Grand Rapids Die

Casting Corp. v. NLRB, 831 F.2d 112 (6th Cir. 1987); who

refuses to testify on the employer's behalf in relation to

charges filed with the Board, NLRB v. Retail Store Employees

Union Local 876, 570 F.2d 586, 590 (6th Cir.), cert. denied,

439 U.S. 819 (1978) ("[c]oercing employees to give untrue

testimony just as surely undermines the integrity of Board

proceedings as does coercing employees to give no testimony

at all"); or whom the employer believes has filed or intends

to file a charge with the Board. First National Bank & Trust

Co., 209 N.L.R.B. 95, enf'd, 505 F.2d 729 (3d Cir. 1974)

(table).

Here the Board found that Ortega had discharged

Quintero, Silva, and the Duque brothers because he believed

"that they had supported Yeppes in relation to the filing of

the unfair labor practice charge." Strictly, it twice used

-14-

the verb "support," and twice the verb "assist." We deduce

from the factual context in which it grounded its finding

that the Board concluded Ortega was motivated by a belief

that the men either had or intended to provide not mere

encouragement or reassurance, but actual, tangible support in

the prosecution of Yeppes' complaint, i.e., in the form of

providing corroborative statements or testimony, which Ortega

knew them to be in a position to do. These men had been part

of the group allegedly laid off by Ortega because of their

union membership and stood in the exact same positions vis a

vis their employer and the Board as did Yeppes, save that

Yeppes had been the only one to actually sign the complaint.

The Board reasonably surmised Ortega's dismissal of the men

to have been prompted by a belief that they had or could

corroborate Yeppes' allegations to the Board, i.e., that they

had or might exercise their rights under the Act.

The order of the Board is therefore affirmed, and

its cross-appeal for enforcement is granted.

-15-