USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-2048 NATIONAL SURFACE CLEANING, INC., Petitioner, v. NATIONAL LABOR RELATIONS BOARD, Respondent. ____________________ ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD ____________________ Before Cyr, Circuit Judge, _____________ Aldrich, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ ____________________ Nathan L. Kaitz with whom Morgan, Brown & Joy was on brief for ________________ ____________________ petitioner. Richard Cohen with whom Frederick Havard, Supervisory Attorney, _____________ _________________ Frederick L. Feinstein, General Counsel, Linda Sher, Acting Associate ______________________ __________ General Counsel, Aileen A. Armstrong, Deputy Associate General ______________________ Counsel, and National Labor Relations Board were on brief for _________________________________ respondent. ____________________ May 15, 1995 ____________________ -2- ALDRICH, Senior Circuit Judge. This is a petition ____________________ by National Surface Cleaning, Inc. to review and set aside an order of the National Labor Relations Board finding that it unlawfully discharged employees Humberto Yeppes, Carlos Silva, Libardo Quintero, and Jairo and Cesar Duque, in violation of Section 8(a)(4) and (1) of the National Labor Relations Act, 29 U.S.C. 158(a)(4) and (1). In re National ______________ Surface Cleaning, 314 NLRB No. 92 (July 28, 1994). The Board ________________ found National violated the Act by notifying Yeppes on March 13, 1993 that he would never work for the company again because of having filed an unfair labor practice charge against it on March 2, 1993, and by discharging the four others for assisting or supporting him. National's position is that (1) substantial evidence does not support the Board's finding as to Yeppes because he was let go prior to its learning of the charge, (2) the Board misconstrued section 8(a)(4) in ruling that it protects the others, and (3) ignored evidence indicating National's actions were in no way based upon the charge. Background __________ National is engaged in asbestos removal at various sites in and around New York. At each site it employs a project manager, foremen, and a crew of asbestos removal workers, members of the Mason Tenders Union. Typically, these workers are hired on a project by project basis. They -3- may be laid off for some time, and recalled when required. As of February 1992 the employees in the present case were all working at 1411 Broadway under project manager Pablo Ortega. On February 21, Ortega laid off the entire crew,1 with the exception of five employees who he brought to a new project at the Grace building. Some of those laid off believed they were not transferred because National intended to complete the Grace job with non-union workers. On March 2, 1992, Yeppes visited the Grace building and thanked Ortega for having employed him at 1411 Broadway, but Ortega did not offer him work at the new site. Later that day, Yeppes filed an unfair labor practice charge with the Board, alleging National laid off its employees at 1411 Broadway and did not recall them to the Grace site because of their union membership. Around March 5 Yeppes and some of the others also complained to the union local. On March 6 or 7, Ortega called Quintero and asked him to contact the group who had been laid off from 1411 Broadway and tell them to report to work at the Grace building on Monday, March 9. Quintero complied, but did not call Yeppes because he regarded Yeppes as a supervisor2 and therefore not included in the group. On March 9, all except Yeppes began working at  ____________________ 1. There was some dispute as to whether Yeppes was laid off at this time or sometime prior to the others. 2. Yeppes had at times been employed as a project manager. -4- the Grace site. -5- National received Yeppes' Board complaint on March 9, and Ortega testified to hearing about it by March 10 or 11. However, a union representative had visited the Grace site to check union cards sometime before March 9.3 On March 12, foreman Javiar Alzate told Quintero, Silva and the Duque brothers upon their arrival at work that they should not begin and to wait for Ortega. According to the employees, when Ortega arrived he accused them of filing a complaint against him, which they denied. He claimed to have seen Yeppes' name on a complaint but admitted he had not seen the others' names. He then told them they were no longer needed at the Grace building but might be able to find work at 100 Wall Street or 1411 Broadway. He also asked Jairo Duque to talk to Yeppes. Ortega testified that he laid them off because they had been late to work on March 12 (and Jairo Duque had missed several days that week) and because they never showed up at 1411 Broadway,4 but it is undisputed that the only subject he discussed with them on the morning of the 12th was the complaint. Later that day foreman Alzate  ____________________ 3. The testimony of Jairo Duque suggests that Ortega was prompted to recall the laid off workers after the union shop steward visited the building. 4. Ortega testified that he called the Duque brothers on Friday evening, March 12, and left a message for them to report to 1411 Broadway the next day for a weekend job. They claim they were never told. They did go to 100 Wall Street on Monday, March 16, but found no one there and, assuming Ortega had misled them, never went to the 1411 Broadway site. -6- told two other employees that a group could no longer work for National because they had put in a complaint against the company. The brother of one of the employees, also a foreman, told him the same thing. On March 13 Ortega called Yeppes and said he had found out about the complaint and was upset that Yeppes had come to thank him and then turned around and filed a charge against him. Yeppes testified that Ortega then told him he would never work for the company again. Ortega denied ever saying this. Yeppes in fact has never worked for National again, and the other four, despite efforts, have also been unable to get themselves rehired.5 Yeppes ______ Section 8(a)(4) of the Act makes it unlawful "to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this Act." N.L.R.A. 8(a)(4), 29 U.S.C. 158(a)(4). The Board found Ortega's decision not to recall Yeppes to the Grace building along with the others on March 9 did not violate the  ____________________ 5. Quintero once sought work at 1411 Broadway with a co- worker, the co-worker was hired, but Quintero was told by a supervisor that he had been instructed not to hire anyone involved in the complaint against the company. Another time, he had been under the impression that he had been rehired, but when he showed up he was informed he was not among those recalled because he was involved in the complaint. Ortega eventually rehired Silva for the 1411 Broadway weekend job, but we decline to disturb the Board's finding that this "simply represents . . . that Ortega changed his mind about Silva," and had no effect on the March 12 events. -7- Act, but that Ortega's March 13 communication with Yeppes to the effect that he would never work for National again because he had filed charges against Ortega and the company, did. The question here is not whether 8(a)(4) applies, but whether Yeppes was effectively discharged on March 13 because of the charge, or for unrelated reasons sometime prior to National's (or Ortega's) awareness of the charge, as National contends. National claims the evidence establishes that Ortega never intended to recall Yeppes after he was laid off sometime in February because he felt he could no longer work with Yeppes6 and never intended to hire him again. It insists that Yeppes had therefore been discharged well before it became aware of his unfair labor practice charge. National points to the fact that on March 2 Yeppes sought out Ortega and thanked him for having given him work, and to Ortega's testimony that he was dissatisfied with Yeppes and that it was his practice simply to never recall such an employee, rather than to inform him that he is permanently discharged, and that all of this conclusively supports the inference that Yeppes had been discharged effective prior to his ever having filed the charge. It furthermore claims the  ____________________ 6. National claims Yeppes had repeated difficulty with Ortega, in large part because he had once been employed as a supervisor and the younger and less experienced Ortega had worked under him. -8- Board had no basis for crediting Yeppes' testimony regarding Ortega's March 13 threat that Yeppes would never work for the company again when Ortega denied ever making it. We are satisfied that the Board reasonably resolved these credibility issues against National, and its conclusion that the March 13 conversation transformed Yeppes' temporary lay off into permanent discharge is supported by substantial evidence. Universal Camera Corp. v. NLRB, 341 U.S. 474, 71 _______________________ ____ S.Ct. 456, 95 L.Ed. 456 (1951). The Board found no evidence Yeppes had been permanently discharged simply by virtue of the fact that he was not recalled along with the others on March 9. Further, simply because Ortega had difficulty working with Yeppes does not mean other National project managers did or would, so even if Ortega himself never intended to recall Yeppes this does not mean he had been discharged by National. Yeppes had completed jobs satisfactorily for other National supervisors, and had been a project manager himself prior to working for Ortega. And if Yeppes had already been permanently discharged, why would Ortega need to tell him on March 13, while castigating him for filing charges against him and the company, that he would never work for the company again, as the Board found. Finally, there was evidence that other supervisors had been told not to use any of the employees associated with filing the charge, providing the Board with reason to conclude -9- Ortega's threat was neither fictional nor -10- idle, and was prompted by and delivered in retaliation for Yeppes' having exercised his rights under the Act. The Four Other Employees ________________________ As to the other four employees, the questions are, first, whether they were discharged; second, if so, whether this was for being late to work and not showing up at a job to which they had allegedly been reassigned, as National contends, or because National believed they had participated in filing charges under the Act, as the Board found; and third, whether 8(a)(4) prohibits an employer from discharging or otherwise discriminating against an employee for believing that he "supported" or "assisted" another in relation to filing such charges against it. Reasons for the Discharge _________________________ The Board concluded that the four had been discharged, "because they had a reasonable basis for believing . . . that the Company no longer desired their services," citing Ridgeway Trucking Co., 243 NLRB 1048 (1979) _____________________ ("the fact of a discharge does not depend on the use of formal words of firing," but upon whether the employer's words or actions "would logically lead a prudent person to believe his tenure had been terminated"). Second, the Board found their discharge was in retaliation for the unfair labor practice charge, which National believed they "supported" or "assisted" Yeppes in filing. -11- National counters that the evidence is clear that Quintero, Silva and the Duque brothers were discharged because they were late to work on March 12, and did not show up at 1411 Broadway on March 14, the job to which Ortega testified he had reassigned them. The Board's considered assessment of the evidence found it did not support this version of events. Again, we find the Board's conclusion is based upon reasonable resolutions of credibility issues. There was no evidence lateness was discussed during Ortega's interrogation of the four employees on the morning of March 12, nor is there any solid evidence each of them was late on that day.7 There was evidence, however, that during this meeting Ortega was visibly upset by news of the charge, initially accused the four men of having filed it, repeatedly questioned them about it, specifically requested that Jairo Duque contact Yeppes in a manner that suggested, as the Board found, that he meant for Jairo to talk Yeppes into dropping the charge, and simultaneously informed all four that they were off the job. The four denied ever being told to report for work at 1411 Broadway on Saturday, March 14. Nor is there evidence that the supervisor on that project expected them. On the contrary, they testified that Ortega told them to try to find ___  ____________________ 7. In fact, there was testimony that Silva was already upstairs suiting up for work when he was told to go back downstairs and wait for Ortega to arrive. -12- work elsewhere, at 100 Wall Street or 1411 Broadway. When they tried the former, they found no one there and concluded they had been, in effect, discharged. The Scope of Section 8(a)(4) ____________________________ National contends in any event that an employer cannot be found in violation of 8(a)(4) for taking an adverse action against an employee unless that employee has, strictly, "filed charges or given testimony under the Act." N.L.R.A. 8(a)(4), 29 U.S.C. 158(a)(4), and that the Board impermissibly broadened its scope by ruling that it also protects supporting or assisting another in relation to the filing of charges. Section 8(a)(4) should be read broadly in favor of the employee, NLRB v. Scrivener, 405 U.S. 117, 122 (1972), ____ _________ NLRB v. Globe Manufacturing Co., 580 F.2d 18, 20 (1st Cir. ____ _______________________ 1978), and the Board's reading, if permissible, is entitled to substantial deference. NLRB v. J. Weingarten, Inc., 420 ____ ___________________ U.S. 251, 266-67 (1974). Scrivener held that 8(a)(4) protected employees _________ who gave sworn statements to a Board field examiner investigating an unfair labor practice charge filed against their employer, although they had neither personally "filed charges" nor literally "given testimony." 405 U.S. 117, 121. The Court found this liberal approach justified by the congressional purpose to allow "all persons with information -13- about [unfair labor] practices to be completely free from coercion against reporting them to the Board," id. at 121 ___ (citation omitted), and to protect the integrity of all investigative stages of Board proceedings and an employee's participation in them, regardless of whether it falls somewhere between an actual filing and formal testifying. Id. at 122-124. ___ The Scrivener rationale has led to the _________ interpretation of 8(a)(4) to protect an employee who merely threatens to file charges with the Board, Grand Rapids Die _________________ Casting Corp. v. NLRB, 831 F.2d 112 (6th Cir. 1987); who ______________ ____ refuses to testify on the employer's behalf in relation to charges filed with the Board, NLRB v. Retail Store Employees ____ _______________________ Union Local 876, 570 F.2d 586, 590 (6th Cir.), cert. denied, ________________ ____________ 439 U.S. 819 (1978) ("[c]oercing employees to give untrue testimony just as surely undermines the integrity of Board proceedings as does coercing employees to give no testimony at all"); or whom the employer believes has filed or intends to file a charge with the Board. First National Bank & Trust ___________________________ Co., 209 N.L.R.B. 95, enf'd, 505 F.2d 729 (3d Cir. 1974) ___ _____ (table). Here the Board found that Ortega had discharged Quintero, Silva, and the Duque brothers because he believed "that they had supported Yeppes in relation to the filing of the unfair labor practice charge." Strictly, it twice used -14- the verb "support," and twice the verb "assist." We deduce from the factual context in which it grounded its finding that the Board concluded Ortega was motivated by a belief that the men either had or intended to provide not mere encouragement or reassurance, but actual, tangible support in the prosecution of Yeppes' complaint, i.e., in the form of providing corroborative statements or testimony, which Ortega knew them to be in a position to do. These men had been part of the group allegedly laid off by Ortega because of their union membership and stood in the exact same positions vis a vis their employer and the Board as did Yeppes, save that Yeppes had been the only one to actually sign the complaint. The Board reasonably surmised Ortega's dismissal of the men to have been prompted by a belief that they had or could corroborate Yeppes' allegations to the Board, i.e., that they had or might exercise their rights under the Act. The order of the Board is therefore affirmed, and ________ its cross-appeal for enforcement is granted. _______ -15-